**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL NO. 2724** <br> **16-md-2724** |
| *IN RE: CLOMIPRAMINE CASES* | **DPP CASE: 16-CM-27241** <br> **EPP CASE: 16-CM-27242** |
| **THIS DOCUMENT APPLIES TO:** <br> *DPP AND EPP BELLWETHER ACTIONS* | |

<u>**MEMORANDUM OPINION**</u>

**Rufe, J.**                                                                 **August 27, 2025**

This multidistrict antitrust litigation ("MDL") concerns alleged price-fixing schemes involving numerous generic drugs and generic drug manufacturers. The Court selected initial bellwether cases from the proposed class actions brought by End-Payer Plaintiffs ("EPPs") and Direct Purchaser Plaintiffs ("DPPs") as to two generic drugs, clomipramine and clobetasol. This Opinion considers various Defendants' motions for summary judgment as to claims in DPPs' and EPPs' clomipramine cases. The Court has considered the parties' briefs, the evidence, and argument presented during two days of hearings. For the reasons set forth below:

- As to Mylan's summary judgment motion in the DPPs' clomipramine case, the Court will deny summary judgment;
- As to Defendants' joint summary judgment motion in the EPPs' clomipramine case, the Court will grant it in part as the motion relates to the consumer protection claims arising from state law in Missouri and Minnesota, and will deny it in part as to the remainder of Defendants' arguments;
- As to Mylan's summary judgment motion in the EPP's clomipramine case, the Court will grant it in part as to EPPs' claims arising from sales of clomipramine from Mylan to CVS pharmacy and will deny it in part as to the remainder of Mylan's arguments;
- As to Taro and Sandoz's summary judgment motion in the EPP's clomipramine case, the Court dismisses the joint motion without prejudice, pending the outcome of each party's settlement agreements with EPPs.

## I.    PROCEDURAL BACKGROUND

In the DPPs' clomipramine case, one Defendant remains—Mylan Inc. ("Mylan"), as DPPs have settled with Sandoz, Inc. and Taro Pharmaceutical U.S.A., Inc. Nevertheless, DPPs continue to seek damages from Sandoz and Taro drug sales from Mylan under joint and several liability.[1] Defendants in the EPP clomipramine case are Mylan Inc., Mylan Pharmaceuticals, Inc., Taro Pharmaceuticals U.S.A., Taro Pharmaceuticals U.S.A., Inc., Sandoz Inc. However, EPPs are in the process of settling with Sandoz and Taro.

Setting the stage for summary judgment rulings, the Court first ruled on *Daubert* challenges to expert witnesses as to clomipramine and clobetasol.[2] Next, the Court certified the following classes of clomipramine plaintiffs in the DPP and EPP cases:

### DPPs

All persons or entities that directly purchased clomipramine (generic clomipramine hydrochloride 25, 50, or 75mg capsules) from one or more of the Clomipramine Defendants in the United States and its territories and possessions at any time during the period from May 1, 2013 through December 31, 2018 (the "Clomipramine Class Period"). Excluded from the Clomipramine Class are (a) the Defendants or former defendants [] and their officers, directors, management, employees, subsidiaries, or affiliates, (b) judicial officers and their personnel, (c) all governmental entities, and (d) all persons or entities that (i) purchased at least one strength of clomipramine (i.e., 25, 50, or 75mg capsules) during the period March 18, 2012 to March 17, 2013 ("Clomipramine Pre Period") and at least one of the same strengths during the Clomipramine Class Period

---

[1] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 1 n.1, No. 16-CM-27241 [Doc No. 159].

[2] *See In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724, 2024 WL 4980784 (E.D. Pa. Dec. 3, 2024) [MDL Doc. No. 3171]. "In DPPs' cases, the Court: (1) granted DPPs' motion to exclude defense expert Dr. Richard Gilbert's opinions in part, related to his testimony that economic evidence has no bearing on the ability to differentiate legal and illegal interdependent conduct; (2) granted Defendants' motion to exclude DPPs' expert Dr. Thomas McGuire, in part, to the extent that he opined that his conditional probability test demonstrated the existence of a "super" plus factor; and (3) granted Defendants' motion to exclude DPPs' expert Dr. Jeffrey Leitzinger's opinions, in part, related to his alternative overcharge model. The Court denied each motion for exclusion related to those experts on all other bases." *In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-27241; 16-MD-27242, 2025 WL 754546, at *3 (E.D. Pa. Mar. 7, 2025) [MDL Doc. No. 3272]. "In EPPs' cases, the Court: (1) granted EPPs' motions to partially exclude the opinions of Dr. James Hughes, Dr. Erin Trish, and Dr. Laura Happe; (2) granted, in part, EPPs' motion to exclude the opinions of Dr. Richard Gilbert; and (3) denied Defendants' motions to exclude the opinions of Dr. James McClave, Dr. Russell Lamb, Laura Craft, and Eric Miller. The Court denied each motion for exclusion related to those experts on all other bases" *In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-27241; 16-MD-27242, 2025 WL 754567, at *3 (E.D. Pa. Mar. 5, 2025) [MDL Doc. No. 3274].

and (ii) whose purchase prices (measured in dollars and cents) for all of the strength(s) purchased in both Periods did not increase during the Clomipramine Class Period as compared to the Clomipramine PrePeriod.[3]

**EPPs**

**<u>Antitrust Damages Class:</u>**

All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clomipramine products (generic clomipramine hydrochloride 25, 50, or 75 mg capsules) purchased in the Antitrust Damages Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from August 1, 2013 through December 31, 2018.

**<u>Consumer Protection and Unfair Competition Damages Class:</u>**

All Third-Party Payers who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Clomipramine products (generic clomipramine hydrochloride 25, 50, or 75 mg capsules) purchased in the Consumer Protection Damages Jurisdictions at retail or via mail-order, for personal use by their members, enrollees or beneficiaries and not for resale, from August 1, 2013 through December 31, 2018.

**<u>Exclusions</u>**

Excluded from each of the three Classes are: (a) Defendants, their subsidiaries, and affiliates; (b) all federal governmental entities; (c) all state governmental entities; and (d) Third-Party Payers for purchases made pursuant to any Medicaid plan, whether fee-for-service or Managed Medicaid.[4]

The Court declined to certify EPPs' proposed Unjust Enrichment class, for reasons stated in the March 2025 Opinion.[5]

---

[3] DPP's Reply Mem. Supp. Mot. Class Certification at 9 n.2, 16-CM-27241 [Doc. No. 105].

[4] EPPs' Mot. Class Cert. at 1-3, No. 16-CM-27242 [Doc. No. 180] (footnotes and emphasis omitted) ("For the avoidance of doubt, the Classes do not include: (a) natural person consumers; (b) Pharmacy Benefit Managers [("PBMs")]; or (c) purchases made other than via retail or mail order. The Classes do include: cities, towns, municipalities, or counties with self-funded prescription drug plans.").

[5] *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724, 2025 WL 754567 at *18 (E.D. Pa., 2025) [MDL Doc. No. 3274].

The parties have fully briefed the motions for summary judgment, including supplemental briefing on the impact of the *Daubert* and class certification rulings.[6] The Court heard oral argument on May 13, 2025.

## II.   LEGAL STANDARD

A court will award summary judgment on a claim, or part of a claim, where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[7] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[8] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor."[10] Such a requirement does not mean that all facts must be viewed in favor of the non-moving party, but only those inferences and assumptions that are reasonable.[11] Further, a court may not weigh the evidence or make credibility determinations.[12] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[13] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[14] This requirement upholds the "underlying purpose of

---

[6] Order, No. 16-MD-2724 (E.D. Pa. Mar. 17, 2025) [MDL Doc. No. 3288].

[7] Fed. R. Civ. P. 56(a).

[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[9] *Id.*

[10] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[11] *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995).

[12] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[14] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[15] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[16]

A summary judgment analysis in an antitrust case largely mirrors the analysis for summary judgment in all other cases.[17] The Supreme Court, however, has highlighted a particular divergence in the evaluation of summary judgment cases for claims brought under Section 1 of the Sherman Act.[18] In antitrust cases such as this one, in which the plaintiffs allege unreasonable restraint of trade through horizontal price fixing under Section 1, proof of a plaintiff's claim may come in the form of direct evidence, which is "explicit and requires no inferences to establish the proposition or conclusion being asserted," or in the form of circumstantial evidence.[19]

However, the Supreme Court has limited the range of inferences that may be made from circumstantial, or ambiguous, evidence. [20] Whether an inference from circumstantial evidence is acceptable varies with the plausibility of plaintiffs' theory of anticompetitive conduct.[21] Thus, evidence of conduct that could have resulted from antitrust behavior or permissible competition, by itself, is insufficient to demonstrate an antitrust conspiracy.[22] To survive summary judgment,

---

[15] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976)).

[16] *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[17] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).

[18] *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (discussing summary judgment under 15 U.S.C. § 1).

[19] *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 118 (3d Cir. 1999).

[20] *Matsushita,* 475 U.S. at 588; *see also InterVest Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003).

[21] *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230-32 (3d Cir.1993).

[22] *Matsushita,* 475 U.S. at 588.

a plaintiff relying on circumstantial evidence in a Section 1 case must provide evidence that "tends to exclude the possibility" that the alleged antitrust event was a result of permissible competitive behavior, rather than permissible independent action.[23] The Third Circuit has held that such evidence by the plaintiff may be provided in the form of parallel price movements.[24] However, because parallel price movements can be a "necessary fact of life"[25] in an oligopolistic market, additional "plus factors" must often be shown to substantiate the inference of a conspiracy rather than permissible behavior.[26] Such "plus factors" include (a) motive; (b) acting contrary to one's interest; and (c) evidence implying a traditional conspiracy.[27] If the plaintiff is unable to provide such evidence, then there is no genuine dispute of material fact, and summary judgment is proper at this stage.[28]

## III.  RELEVANT FACTS COMMON TO DPPs' AND EPPs' CLOMIPRAMINE CASES[29]

Approximately 88% of pharmaceutical prescriptions in the United States are filled with a generic drug.[30] By definition, generic drugs are "the same as a brand name drug in dosage,

---

[23] *Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752, 764 (1984).

[24] *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 193 (3d Cir. 2017).

[25] *In re Baby Food,* 166 F.3d at 122.

[26] *Valspar,* 873 F.3d at 193.

[27] *Id.* While normally all three plus factors are weighed together, in the case of oligopolies the first two factors are deemphasized because they "largely restate the phenomenon of interdependence." *In re Flat Glass,* 385 F.3d at 360.

[28] *Matsushita,* 475 U.S. at 597-98. Since those qualities are intrinsic to oligopolies, we instead focus on the third plus factor: "evidence implying a traditional conspiracy." *In re Flat Glass*, 385 F.3d at 360 (citation omitted). To meet this factor, we require "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Id*. at 361.

[29] The parties did not file joint stipulations of material facts. Instead, each brief included sections setting out relevant facts. The Court draws the factual background from the uncontested portions of each statement of facts and *appropriate evidence* introduced by the parties related to the claims. A fuller discussion of the allegations in the MDL may be found in the Court's Opinions of October 16, 2018, and February 15, 2019. *See In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 411–34 (E.D. Pa. 2018); *In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 820–27 (E.D. Pa. 2019).

[30] GPhA, Generic Drug Savings in the U.S. at 3 (2015) ("GPhA Report"), https://accessiblemeds.org/wp-content/uploads/2024/12/2015-GPhA-Annual-Report.pdf [https://perma.cc/MB8N-D3W2] .

safety, strength, how it is taken, quality, performance, and intended use," and are expected to have equal effect as the branded equivalent.[31] Typically, generic drugs are beneficial because they cost substantially less than their branded counterparts—on average costing 75% of the retail price of a brand-name drug.[32]

Clomipramine is a generic tricyclic antidepressant oral medication used to treat obsessive compulsive disorder.[33] Defendants are pharmaceutical manufacturers that have received regulatory approval to produce and sell oral capsules with dosages of 25mg, 50mg, and 75mg. I Defendants Sandoz, Mylan, and Taro each received approval to market generic clomipramine products between 1996 and 1998.[34]

The pharmaceutical drug supply chain begins with manufacturers, who make the drug and then sell it to wholesalers. Wholesalers distribute the drugs to pharmacies, which then dispense the drugs to consumers who either pay for the drug themselves, if uninsured, or pay for a portion of the drug through a co-pay or co-insurance if insured.[35] Plaintiffs include classes made up of two groups of entities in the generic drug supply chain. The Direct Purchaser Plaintiffs ("DPPs") are entities, such as drug wholesalers, that purchased clomipramine directly from Defendants.[36] The DPP class includes a number of purchasing entities, including large wholesalers such as McKesson, Cardinal Health, and AmerisourceBergen, as well as other

---

[31] U.S. Food & Drug Admin., *Drugs@FDA Glossary of Terms, "Generic"*, , http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G [https://perma.cc/C5AK-MQU2].

[32] CBO, Effects of Using Generic Drugs on Medicare's Prescription Drug Spending (Sep. 15, 2010) at 8-9, https://www.cbo.gov/publication/21800 [https://perma.cc/C5VL-VT3D].

[33] *See* EPPs' Consolidated Class Action Compl. ¶ 2, No. 16-CM-27242 [Doc. No. 127].

[34] *See* DPPs' Consolidated Class Action Compl., ¶¶ 27-29, No. 16-CM-27241 [Doc. No. 61].

[35] *See* EPPs' Consolidated Class Action Compl. ¶ 58, No. 16-CM-27242 [Doc. No. 127].

[36] *See* DPPs' Consolidated Class Action Compl. ¶ 1, No. 16-CM-27241 [Doc. No. 61].

retailers and pharmacies.[37] The End-Payer Plaintiffs ("EPPs") are third-party payers who did *not* purchase the drug directly from manufacturers, but who ultimately bear the responsibility for the costs of generic drugs and drug services.[38] EPPs include insurers and health and welfare benefit plans that purchase generic pharmaceuticals or provide prescription drug benefits to a multitude of individuals.[39] The certified class periods are from August 1, 2013 through December 31, 2018 (EPPs) and May 1, 2013 through the December 31, 2018 (DPPs).[40]

In substantial part, DPPs and EPPs rely on the same factual background. Although the generic clomipramine market originally included five suppliers, from 2010 to spring 2013, Mylan, Sandoz, and Taro operated in a three-player market, which the DPPs and EPPs concede operated as an oligopoly.[41] Between 2012 and 2015, these Defendants were responsible for producing more than 95% of generic clomipramine in the United States.[42]

Pharmaceutical pricing typically begins with the Wholesale Acquisition Costs ("WAC") or Average Wholesale Price ("AWP"), which are recognized in the industry as reference prices for each given product, dosage, and package combination to serve as a "baseline highest price" that manufacturers are able to charge customers.[43] Prices for clomipramine remained relatively stable until spring 2013.[44] Between January 2010 and February 2013, the price of generic

---

[37] *See* Mylan Mem. Supp. Summ. J. at 5-6, No. 16-CM-27241 [Doc. No. 150].

[38] Mylan Mem. Supp. Summ. J. at 6, No. 16-CM-27241 [Doc. No. 302].

[39] *See* EPPs' Consolidated Class Action Compl. ¶¶ 31-38, No. 16-CM-27242 [Doc. No. 127].

[40] *See* EPPs' Mot. Class Certif. [Clomipramine], No. 16-CM-27242 ¶ 1 [Doc. No. 180]; DPPs' Mem. Supp. Mot. Certification Class Clomipramine Direct Purchasers at 20-21, 16-CM-27241, [Doc. No. 87].

[41] DPPs' Mem. Opp'n Mylan Mot. Summ. J. at 3-4, 16-CM-27241[Doc. No. 159]. Actavis had an abbreviated new drug application ("ANDA") but "never marketed" clomipramine. Ex. 3, ACTAVIS_GX_MDL010717128-29 [Doc. No. 159-5].

[42] EPPs' Opp'n Taro & Mylan Mot. Summ. J. at 6, 16-CM-27242 [Doc. No. 324].

[43] *Id*.

[44] *Id.* at 7.

clomipramine ranged between 23 cents to 54 cents per capsule, varying based on dosage.[45]
Beginning in May 2013, Plaintiffs allege that Mylan, Sandoz, and Taro agreed to raise the WAC
for clomipramine.[46] Defendants contend that increases in price occurred due to legal behavior in
an oligopolistic market. In any case, the first significant price increase occurred when Taro
increased prices for clomipramine by 1,935 to 3,441% on May 1, 2013, a few days after they
informed customers of the planned increase.[47] On May 13, Mylan's Pricing Committee approved
clomipramine price increases of 1,566 to 2,853%, to take effect on May 16, 2013.[48] Sandoz
implemented its price increases of 1,770 to 2,778 later that year, on July 22, 2013.[49]

     The present matters spurred out of a criminal investigation into this conduct, which
ultimately resulted in Deferred Prosecution Agreements ("DPAs") between both Taro and
Sandoz and the United States Department of Justice. Chris Bihari, former Sandoz Director of
National Accounts, Mike Vezza, former Sandoz Associate Director of Pricing & Contracts, and
Della Lubke, former Sandoz Director of National Accounts all testified in deposition that Sandoz
and Taro agreed to raise the list prices for clomipramine.[50] Bihari testified that Taro and Sandoz
had an "understanding" that Sandoz would follow price increases once they were initiated by
Taro and that Armando Kellum of Sandoz and Vezza received pricing information "[t]o ensure
that they…were aware that Taro was planning an increase and for Sandoz to do the same."[51]
Bihari further confirmed that he had a general practice of sharing competitor price information

---

[45] *Id*.

[46] EPPs' Consolidated Class Action Compl. ¶¶ 89-92, No. 16-CM-27242 [Doc. No. 127].

[47] EPPs' Opp'n Taro & Mylan Mot. Summ. J., 16-CM-27242 at 22-23 [Doc. No. 324].

[48] *Id*. at 25-26.

[49] *Id*. at 31.

[50] EPPs' Opp'n Taro & Mylan Mot. Summ. J. at 9-10, 16-CM-27242 [Doc. No. 324].

[51] EPPs' Ex. 9 at 779-80, 16-CM-27242 [Doc. No. 324-12].

with Kellum and Vezza, who would then use that information to make their own pricing decisions.[52] When Bihari was directly asked if there was an agreement between Sandoz and Taro on clomipramine, Bihari responded "[y]es" and elaborated that the agreement was to keep prices high and allocate market share.[53] Bihari confirmed that Kellum and Vezza participated in the agreement.[54] Vezza testified in his deposition that he participated in the agreement, which he explained was intended to increase prices and "have the prices *stick* and to achieve better prices."[55]

Although Bihari and Vezza both testified to the existence of an agreement between Taro and Sandoz, each testified that they did not enter into or did not recall entering into any agreements to fix the prices of any product with Mylan.[56] The evidence shows phone calls between Lubke and Jim Nesta of Mylan, who had no extra-professional relationship before their communications, regarding competitive pricing positions.[57] Lubke testified that it was "highly probable" that, during a May 13, 2013 phone call, she coordinated with Nesta regarding the Mylan Pricing Committee's decision to approve a proposal to match Taro's clomipramine price hike. Lubke explained that Nesta gave her a "heads-up" that Mylan planned to institute a price increase on clomipramine before Taro increased its price for clomipramine.[58] Further, Lubke testified that she received pricing information during two phone calls with Nesta on July 16,

---

[52] *Id*. at 499-502

[53] *Id*. at 794.

[54] *Id*. at 794-95.

[55] EPPs' Ex. 11 T 1178-79, [Doc. No. 324-14] (emphasis added).

[56] Mylan Mem. Supp. Summ. J. at 22-23, No. 16-CM-27241 [Doc. No. 150].

[57] Mylan Ex. 89 at 361-62, No. 16-CM-27241 [Doc. No. 150-82].

[58] *Id.* at 434 .

2013, which she later communicated to her superiors.[59] Lubke testified that she informed Nesta that she needed to understand which products Mylan would implement price increases on so that "[Sandoz] could follow."[60] In between the first and second phone calls, Lubke testified that her understanding was that Nesta found products that overlapped with Sandoz, which he then shared with Lubke.[61] Lubke testified that her calls with representatives from the other companies were intended to further a conspiracy to raise prices and that she shared competitively sensitive information with executives from those companies.[62] Lubke explained that she "didn't make a commitment, other than…that [Sandoz would] follow."[63] Although Lubke testified that she herself did not have the authority to make a decision to follow, her understanding from her superiors was that it was Sandoz's intent to follow.[64]

In addition to these communications, EPPs and DPPs rely on a number of communications among alleged co-conspirators Ara Aprahamian and Michael Perfetto of Taro and Michael Aigner of Mylan—to support their claim that the Defendants exchanged confidential information concerning the pricing of clomipramine, which in turn affected clomipramine pricing decisions by each Defendant. On March 18, 2013, Aprahamian began working at Taro, after previously working at Actavis.[65] On April 3, Aprahamian created a document regarding pricing decisions that identified 10 generic drugs, including clomipramine.[66]

---

[59] *Id.* at 474-76.

[60] *Id*.

[61] *Id*.

[62] *Id*. at 360-63.

[63] *Id*. at 476.

[64] *Id.* at 476-477.

[65] *See* Mylan Mem. Supp. Summ. J. at 9-10, No. 16-CM-27241 [Doc. No. 150].

[66] *See* DPPs' Ex. 19, No. 16-27241 [Doc No. 159-21].

The next day, April 4, 2013, phone records reflect that Aprahamian spoke with Aigner for 15 minutes and then immediately called Bihari of Sandoz.[67] Aigner has not yet testified as to the contents of his phone call with Aprahamian, but Bihari testified that his communications with Aprahamian included an agreement that Sandoz would follow Taro's price increases and not take market share.[68] On April 8, Mylan identified clomipramine as a "Taro price increase item."[69] On April 19, Bihari spoke with Aprahamian on the phone for 13 minutes, immediately after which Aprahamian phoned Aigner. On April 30, Bihari and Aprahamian spoke on the phone three times, the same day Bihari made a note indicating clomipramine as a price increase item with a line pointing to "T, M, S," which DPPs contend stands for Taro, Mylan, and Sandoz.[70] The next day, May 1, 2013, Aigner called and spoke with Aprahamian on the phone.[71] Between May 8 and 10, Aigner and Aprahamian spoke five times and on May 10, Nesta sent an email saying that he did not "want to take business from [Taro] thinking we are not following."[72] Bellwether Plaintiffs provide the following summary charts of the various phone calls between the various Defendants, leading up to and during the alleged conspiracy, in context with the timing of each entities' implementation of their clomipramine price increases:

---

[67] *Id.*

[68] *See* DPPs' Ex. 5 at 781, No. 16-CM-27241 [Doc No. 159-7].

[69] DPPs' Opp'n Mylan Summ. J. at 48, No. 16-CM-27241 [Doc No. 159].

[70] *See* DPPs' Ex. 31 at 28, No. 16-CM-27241 [Doc No. 159-33].

[71] *See* Tr. of Summ. J. Hearing (May 13, 2025) at 65 [MDL Doc. No. 3396].

[72] DPPs' Ex. 54 at 2, No. 16-CM-27241 [Doc No. 159-54].





In addition to the phone calls illustrated above, Della Lubke, Director National Accounts at Sandoz, and Nesta engaged in two phone calls on July 16, 2013—during which Lubke

testified they discussed pricing information.[73] Defendants, in turn, dispute that the parties engaged in illegal conduct during any communications with their competitors.

## IV.  DISCUSSION

### A.    Mylan's Motion in DPP Case

Mylan is the sole Defendant remaining in the DPPs' Clomipramine class action, following DPPs' settlements with Defendants Sandoz and Taro. DPPs' Complaint alleges that, in terms of revenue, in 2014 Mylan garnered the largest share of the clomipramine market among Defendants, with sales to direct purchasers at approximately $96 million.[74] Before the class period, DPPs allege that Mylan's average effective price per unit of its products was $0.12, $0.16, and $0.24 for its 25 mg, 50 mg and 75 mg products respectively. DPPs allege that by June 2013, the manufacturers began a dramatic increase of its prices, which they say increased by as much as 3,276%.[75] DPPs contend that Mylan's effective prices increased unexpectedly—settling at 2,500% above their previous levels—and would not have done so without the presence of a price-fixing conspiracy.[76] DPPs argue that they present both direct and circumstantial evidence that these increases were effectuated by a conspiracy among Defendants to raise the prices of clomipramine.

DPPs allege that Defendants artificially inflated and fixed the price of clomipramine in violation of Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."[77] Horizontal price

---

[73] Mylan Ex. 89 at 474, No. 16-CM-27241 [Doc. No. 150-82].

[74] *See* DPPs' Consolidated Class Action Compl. ¶ 63, No. 16-CM-27241 [Doc. No. 61].

[75] *Id*. at ¶ 68.

[76] *Id*. at ¶ 69.

[77] 15 U.S.C. § 1. *See* DPPs' Consolidated Class Action Compl. ¶ 3, No. 16-CM-27241 [Doc. No. 61].

fixing between competitors is a restraint of trade analyzed under the per se standard.[78] In such cases, the plaintiff need only prove that defendants conspired among each other and that the conspiracy proximately caused plaintiff's injury.[79]

Mylan argues that the per se standard does not apply in this circumstance because Plaintiffs allege only exchanges of information and not conduct that is per se illegal under the antitrust laws. According to Mylan, the Court should, instead, review the evidence under the rule of reason test, which would entail the Court's assessment of whether the challenged conduct was an anticompetitive practice.[80] Mylan alleges that DPPs only present one exchange of information, which is not "horizontal price fixing" and, they argue, should not be treated as per se illegal collusion. DPPs, however, allege a per se violation—including not only certain communications by individuals at Mylan with other representatives of various manufacturers, but Mylan's participation in a conspiracy between competitors, which they purport is evidence through communications, testimony, conduct, documents, and economic evidence.[81] The Court will evaluate DPPs' direct and circumstantial evidence under the per se standard.

Mylan argues that DPPs have failed to meet their burden of offering sufficient direct or circumstantial evidence of antitrust violations.[82] Mylan puts forth four primary arguments: (1) that DPPs fail to put forth direct evidence to support their conspiracy allegations; (2) that DPPs similarly fail to put forth sufficient circumstantial evidence of the conspiracy; (3) that Mylan cannot be held liable for actions that occurred after their last noted communication; and (4) that

---

[78] *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 395 (3d Cir. 2015).

[79] *Id.*

[80] *See* Mylan Mem. Supp. Summ. J. at 38-39, No. 16-CM-27241 [Doc. No. 150].

[81] DPPs' Opp'n Mylan Summ. J. at 60, No. 16-CM-27241 [Doc No. 159].

[82] Mylan Mem. Supp. Summ. J. at 17, No. 16-CM-27241 [Doc. No. 150].

DPPs' allegations fail under *Comcast Corp. v. Behrend*[83] because they cannot disaggregate among the effects of the alleged price-fixing, bid-rigging, and allocation conduct.

### Direct Evidence

Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted."[84] Put another way, DPPs' direct evidence must plainly show that a conspiracy existed.[85] DPPs present explicit admissions from Bihari, Vezza, and Lubke, the former Sandoz employees who participated in the conspiracy and testified as cooperating witnesses.[86] Mylan, however, argues that those communications were typical of the industry and do not evince direct evidence of cooperation among the companies to fix prices for clomipramine.[87]

Mylan asserts that none of the cooperating witnesses were high level executives with the authority to enter into an agreement and that DPPs "attempt to cobble together evidence of agreements based on scattered communications between lower-level employees."[88] Further, they draw attention to the fact that Bihari and Vezza both testified that they did not enter into an agreement with anyone at Mylan concerning any products—and that Lubke testified that she did not have the authority to enter into an agreement and did not "make any commitment" to Nesta.[89]

---

[83] 569 U.S. 27 (2013).

[84] *In re Baby Food,* 166 F.3d at 118; *see also InterVest, Inc.,* 340 F.3d at 149 ("cases require that direct evidence of an illegal agreement [must] be established with much greater clarity" than the ambiguous statements plaintiffs offered to show an agreement).

[85] *In re Baby Food*, 166 F.3d at 118.

[86] Direct evidence may include "an explicit admission from a participant that an antitrust conspiracy existed." *In re Chocolate*, 801 F.3d at 396.

[87] Mylan Mem. Supp. Summ. J. at 17-19 , No. 16-CM-27241 [Doc. No. 150].

[88] *Id.* at 23 [Doc. No. 150].

[89] Mylan Ex. 83 at 1224-25, No. 16-CM-27241 [Doc No. 150-82].

DPPs argue in response that "each side of the triangulated clomipramine conspiracy had its own channel of communication" (i.e. certain employees from certain entities communicated with one another and not every employee from every company would be privy to the dealings ongoing with another entity) and "the testimony of Vezza and Bihari simply reflects that they were not part of the channel of communication that Sandoz used to facilitate the clomipramine conspiracy with Mylan."[90] Relevant to Mylan's present motion is whether DPPs have put forth direct evidence that Mylan entered into an agreement to raise the price of clomipramine. The Court concludes that the testimony does not constitute *direct* evidence of an agreement between Mylan and either Sandoz or Taro. Bihari and Vezza testified that they did not communicate with Mylan. Lubke testified that she did not have the authority to enter into an agreement with Mylan and did not make any specific commitment to Nesta except that Sandoz intended to follow Mylan's pricing decisions.[91] DPPs point out that Lubke testified that her superiors at Sandoz, who did have pricing authority, specifically asked her to obtain information about Mylan's price increases and advised her that Sandoz wanted to follow Mylan's price increases.[92] Although that testimony reflects highly suspicious exchanges of information, it is not direct evidence of an agreement. Direct evidence of a conspiracy must be sufficiently detailed to form an independently adequate basis of demonstrating the likelihood of a conspiracy at summary judgment.[93] Lubke's testimony constitutes circumstantial evidence, which the Court will evaluate *infra*, but the conversations between Lubke and Nesta alone are not sufficiently detailed to prove the alleged conspiracy.

---

[90] DPPs' Opp'n Mylan Summ. J. at 33, No. 16-CM-27241 [Doc No. 159].

[91] *See* Mylan Ex. 89at 475-77, No. 16-CM-27241 [Doc. No. 150-82].

[92] *See* DPPs' Ex.7, No. 16-CM-27241 at 699 [Doc No. 159-9].

[93] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-24 (3d Cir. 2010).

*Circumstantial Evidence*

Because DPPs do not show direct evidence of Mylan's participation in a conspiracy, the Court analyzes DPPs' circumstantial evidence to determine whether it gives rise to a reasonable inference of conspiracy. "[A] nonmovant plaintiff in a [S]ection 1 case does not have to submit direct evidence, i.e., the so-called smoking gun, but can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence."[94]

The parties agree the market for clomipramine was an oligopoly before and during the 2013 price increase.[95] "Oligopolies pose a special problem . . . because rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing. . . [and can be the] result of 'interdependence,' which occurs because 'any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.'"[96] Defendants, however, are not entitled to summary judgment just by arguing that there is a plausible explanation for their potentially anticompetitive behavior.[97] Instead, the Court analyzes the evidence to determine whether there is parallel conduct and, if parallel conduct did occur, whether the non-movant party meets certain plus factors, including: (a) motive; (b) acting contrary to one's interest; and (c) evidence implying a traditional conspiracy.[98] Mylan argues that DPPs can neither show parallel conduct, nor any of the plus factors that apply in this matter.

---

[94] *Petruzzi's*, 998 F.2d at 1230.

[95] *See* DPPs' Opp'n Mylan Summ. J. at 23, No. 16-CM-27241 [Doc No. 159].

[96] *Valspar*, 873 F.3d at 191.

[97] *In re Chocolate*, 801 F.3d at 396-97.

[98] *Id.* at 398. "While normally all three plus factors are weighed together, in the case of oligopolies the first two factors are deemphasized because they "largely restate the phenomenon of interdependence." *In re Flat Glass,* 385 F.3d at 360.

a) *Parallel Conduct*

In order to show that they can create a material dispute of fact through inferences based on circumstantial evidence of consciously parallel behavior, the Third Circuit requires that plaintiffs must first establish that defendants' behavior was parallel in that it occurred at approximately the same time and in approximately the same scope, defendants were conscious of each other's conduct, and that awareness was an element in their decision-making process.[99] Mylan contends that "DPPs' reliance on evidence of purported parallel conduct fails because (1) the evidence shows that Defendants' pricing was not coordinated or parallel, and (2) lawful interdependence readily explains the conduct."[100] Mylan argues that its own price increases were sequential, following its competitors rather than occurring at the same time, and that these various WAC price increases were spread out over months and publicly known, allowing manufacturers to gather public information on competitor prices and make decisions sequentially and according to that publicly available data.[101] Rather than collusion, Mylan argues that its decision to match Taro's WAC prices evidences its own internal analyses and sophisticated models—not any illegal agreement between competitors.[102] This, they argue, is typical of an oligopoly and of lawful, independent decision-making.[103]

Moreover, Mylan argues that DPPs assert that a conspiracy was effectuated through an agreement to raise the WAC of clomipramine but argue that DPPs lack sufficient evidence to prove that those increases translated to a conspiracy to raise actual prices.[104] In other words,

---

[99] *In re Flat Glass,* 385 F.3d at 360.

[100] Mylan Mem. Supp. Summ. J. at 27, No. 16-CM-27241 [Doc. No. 150].

[101] *Id*.

[102] *Id*. at 28.

[103] *Id.*

[104] *Id*. at 17.

Mylan argues that WAC is not a good measure by which to prove a conspiracy because, as a benchmark, it does not reflect the *actual* prices that direct purchasers actually paid for clomipramine. Thus, Mylan argues that DPPs have failed to demonstrate that list price increases resulted in actual parallel pricing increases to consumers because, as Mylan argues, DPPs do not have evidence of price-fixing as to the *actual* prices paid for clomipramine by customers— meaning the net prices against contract prices that result from individual negotiation and pricing concessions.[105] According to Mylan, the record shows that, despite list price increases by manufacturers between May and July 2013, Defendants "aggressively competed" on the *actual* discounted prices for clomipramine. This is reflected, Mylan argues, in the telephone conversations discussed above, as Mylan alleges that they exchanged no information about net or actual pricing with competitors.[106] Without information as to the "actual" prices, as opposed to WAC prices, Defendants argue that DPPS "are left with an alleged conspiracy untethered from any purported impact to Clomipramine purchasers" which they contend fails as a matter of law.[107]

This Court previously held at the motion to dismiss stage that "[p]laintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct…'Rather, they must allege price increases that are 'reasonably proximate in time and value.'"[108] At summary judgment, this does *not* require that

---

[105] Price concessions include "rebates, discounts (of many types), and chargebacks" and result in the difference between the list price and the actual prices paid by each customer. *Id.* at 18.

[106] *Id*.

[107] *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 236 (1993) ("[I]n an oligopoly setting, in which price competition is most likely to take place through less observable and less regulable means than list prices," and thus one cannot "draw conclusions" about "tacit coordination or supracompetitive pricing from data that reflect only list prices.").

[108] *In re Generics,* 338 F. Supp. 3d at 441 (quoting *In re Blood Reagents*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010)).

the entities acted identically or that they engaged in identical conduct.[109] DPPs point to WAC price increases by Mylan that evidence of parallel increases by other manufacturers satisfies their burden to produce evidence of conscious parallelism.[110] DPPs further argue that (1) the timing of WAC increases is evidence of parallel conduct, (2) that the WAC price increases did increase actual transaction prices.[111]

DPPs sufficiently demonstrate that Mylan's price increases ran parallel to price increases by Taro and Sandoz. With respect to timing and conduct, DPPs argue that Mylan matched Taro's May 1, 2013 WAC price with its own similar increase on May 16, 2013, which DPPs contend was approved by Mylan's Pricing Committee on May 13, 2013.[112] Although Sandoz did not raise its prices until July 2013, internal documents reflect that the company initially intended to institute increases on certain products, including clomipramine, on May 10, 2013, but ultimately decided to delay due to price protection clauses in certain customer contracts.[113] Thus, Mylan's argument that Sandoz's July 2013 increase demonstrates that the increases were not parallel— being months apart—does not defeat DPPs' evidence of parallel conduct for summary judgment. That the manufacturers all increased, or are on record as intending to increase, their WAC prices at substantially the same time (within a matter of weeks) to a reasonably similar price is sufficient evidence of conscious parallelism in these circumstances to move DPPs' claims past summary judgment.

---

[109] *Id.* at 442.

[110] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 35-36, No. 16-CM-27241 [Doc No. 159].

[111] *Id*. at 35-41

[112] *See id.* at 35-36.

[113] *Id*. at 36.

Mylan next argues that DPPs' claim fails because the alleged conspiracy intended to raise WAC as opposed to actual transaction prices. But if proven, a horizontal agreement to fix prices is illegal even if it does not succeed.[114] DPPs have raised issues of material fact, through their experts, to show that all or nearly all of their class members experienced significant price increases. DPPs' expert Dr. Leitzinger presents analyses that the vast majority of DPP class members experienced a 1,600% price increase, at minimum, for clomipramine following the May 2013 to July 2013 list price increases.[115] Mylan emphasizes that DPPs' allegations pertain only to coordinated efforts to raise reference prices. But the evidence in the record creates a reasonable inference: what other goal would manufacturers hope to accomplish in raising list prices other than to cause an increase in their actual prices?[116] Mylan itself admits that it used those reference prices to increase the price of, or profitability, of clomipramine.[117]

Whether, as Mylan argues, DPPs fail to meet their burden at this stage because these price increases were attributable to legal oligopoly behavior is addressed under the relevant assessment of plus factors.

---

[114] *In re Flat Glass*, 385 F.3d at 363 ("[A] horizontal agreement to fix prices need not succeed for sellers to be liable under the Sherman Act; it is the attempt that the Sherman Act proscribes.").

[115] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 38, No. 16-CM-27241 [Doc. No. 159]; Leitzinger Rebuttal Report, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 94, ¶ 15 & Ex. 5A, No. 16-CM-27241 [Doc. No. 159-94].

[116] *In re Flat Glass*, 385 F.3d at 362-63 ("[S]ellers would not bother to fix list prices if they thought there would be no effect on transaction prices." (quoting *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 656 (7th Cir. 2022)).

[117] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 4 [DPPs], No. 16-CM-27241 [Doc. No. 150] ("[T]he price increase on an unprofitable product in a limited-competition market was entirely rational[.]"); *id.* at 7 ("By or before 2012, Mylan recognized that the product was unprofitable and that its prices did not reflect then-current market realities… Accordingly, Mylan decided to raise its WAC for Clomipramine, and Mylan's Pricing Committee approved a 20% WAC increase for Clomipramine in October 2012.").

b) *Plus Factors*

Mylan further argues that DPPs' claims cannot survive the Third Circuit's "plus factors" applied to circumstantial evidence. A plus factor is an action that is inconsistent with unilateral conduct, and which then allows inference of an agreement. Courts typically look to various "plus factors" in antitrust cases to distinguish legal conscious parallelism from illegal price-fixing agreements.[118] The Third Circuit has identified three "plus" factors: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'"[119] In addition, the Third Circuit has explicitly said that "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor[.]'"[120]

**Motive to Conspire**

Evidence that the market was conducive to price fixing is sufficient as evidence to demonstrate that parties had a motive to conspire.[121] Mylan argues that the plaintiffs fail on this point because Mylan's motive was simply to follow Taro's lead in setting prices that would affect profit maximization.[122] DPPs' expert, Dr. McGuire, according to Mylan, failed to consider that (i) clomipramine was unprofitable for Mylan before the May 2013 WAC increase, (ii) that Mylan had previously approved a series of price increases (which Dr. McGuire concedes were lawful), and (iii) the evidence and economic literature demonstrate that market forces had made

---

[118] *See In re Baby Food,* 166 F.3d at 122.

[119] *In re Chocolate*, 801 F.3d at 398 (quoting *In re Flat Glass*, 385 F.3d at 360).

[120] *In re Ins. Brokerage,* 618 F.3d at 323.

[121] *In re Chocolate*, 801 F.3d at 398 ("Evidence of a motive to conspire means the market is conducive to price fixing.").

[122] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 30 [DPPs], No. 16-CM-27241 [Doc. No. 150].

clomipramine pricing ripe for an increase.[123] Thus, Mylan argues that evidence on this point only restates that the market for clomipramine was an oligopoly and that the parties acted as expected under such conditions.[124] DPPs dispute Mylan's analysis that its pre-conspiracy sales were unprofitable and draws attention to Mylan's 2,500% WAC increases in 2013, which were significantly larger than other WAC increases, and which the company similarly made under oligopolistic market conditions.[125] Given market concentration and high barriers to entry in the market, the Court concludes that there is sufficient evidence from which a reasonable factfinder could determine that Defendants did have a motive to conspire: "There is little doubt that [a] highly concentrated market for a commodity-like product with no viable substitutes and substantial barriers to entry was conducive to price fixing."[126] Satisfaction of this plus factor, however, "does not itself create a reasonable inference of concerted action because it merely restates interdependence."[127]

**Conduct Against Self Interest**

"[E]vidence of actions against self-interest means there is evidence of behavior inconsistent with a competitive market."[128] Mylan argues that DPPs have not established that Mylan acted against its self-interest or that it had acted against its good faith business judgment.[129] Evidence that Mylan acted contrary to its self-interest "means evidence of conduct

---

[123] *Id.* at 31.

[124] *Id.* at 30-31.

[125] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 42-43, No. 16-CM-27241 [Doc. No. 159].

[126] *In re Valspar*, 873 F.3d at 197.

[127] *In re Chocolate,* 801 F.3d at 398.

[128] *Id.*

[129] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 31 [DPPs], No. 16-CM-27241 [Doc. No. 150].

that would be irrational assuming that the defendant operated in a competitive market."[130] DPPs argue that Defendants acted against their independent self-interest by: (1) sharing pricing information with purported competitors;[131] (2) declining opportunities to obtain new business;[132] and (3) imposing a massive price increase that was unsupported by supply, demand, or cost conditions.

In *In re Flat Glass Antitrust Litigation*, the Third Circuit determined that evidence of actions contrary to self-interest existed where there was no proof that price increases were caused by changes in costs or demand.[133] Similarly, in *In re Chocolate Confectionary Antitrust Litigation*, the Third Circuit found that the plaintiffs had satisfied their burden to show conduct against self-interest where plaintiffs' experts opined that cost increases could not explain price increases.[134] Here, DPPs' expert, Dr. McGuire, has opined that the 2013 price increases were inconsistent with supply, demand, and cost conditions and that no price shocks or other such market conditions could have caused the increase in list prices.[135] Further, Lubke's testimony that she and Nesta, a Mylan employee, exchanged price information and that Mylan provided Sandoz with a list of its price increases is contrary to Mylan's self-interest under this plus factor.

---

[130] *In re Flat Glass*, 385 F.3d at 360-61.

[131] Unilateral sharing of price information with a competitor is inconsistent with a company's self-interest. *Id.* at 361, n.12 ("[C]ertain types of 'actions against self-interest' . . . such as apparently unilateral exchanges of confidential price information, cannot simply be explained as a result of oligopolistic interdependence.").

[132] *Petruzzi's*, 998 F.2d at 1245 ("[A]bsent an agreement it does not make economic sense for defendants not to bid on an account, unless they have some problem like capacity or they know the existing price is too high.").

[133] 385 F.3d at 362.

[134] 801 F.3d at 399.

[135] According to Dr. McGuire, "[a] demand shock corresponds to an outward shift of the entire demand curve leading to the movement of the equilibrium price and quantity along an upward-sloping supply curve" and "[a] supply shock corresponds to an inward shift of the entire supply schedule, leading to movement of equilibrium price and quantity along a downward-sloping demand curve." McGuire Expert Report, Mem. Law. Supp. Defs.' Mot. Exclude McGuire Ex. 1 ¶¶63, 71, No. 16-CM-27241 [Doc. No. 93-2] (emphasis omitted).

DPPs have met their burden as to this plus factor. However, like the previous plus factor, this weighs only slightly in DPPs' favor.

**Traditional Evidence of a Conspiracy**

Traditional evidence of a conspiracy is the most important factor when evaluating circumstantial evidence of a conspiracy in an oligopolistic market.[136] This element requires plaintiffs to provide "proof that the [conspirators] got together and exchanged assurances of common action or otherwise adopted a common plan."[137] This includes non-economic evidence that there was an "actual, manifest agreement not to compete . . . even though no meetings, conversations, or exchanged documents are shown."[138]

Mylan argues that DPPs have not provided sufficient traditional evidence to demonstrate that the alleged conspirators exchanged any assurances of common action. DPPs counter by drawing on five sources of traditional evidence: (1) that Mylan, Sandoz, and Taro communicated about price increases; (2) that Mylan had advance knowledge of Taro's price increase; (3) that adverse inferences should be drawn from co-conspirators' invocation of the Fifth Amendment; (4) that economic evidence supports the inference of conspiracy; (5) and that Mylan's remaining arguments are disputed facts to be resolved by a jury. Mylan, however, contends that the sum total of the evidence—including testimony by cooperating witnesses, phone logs, and other circumstantial evidence—is not sufficient to prove a traditional conspiracy. Further, Mylan argues in reply that DPPs failed to refute evidence that clomipramine had become unprofitable, that Mylan was an oligopolist (meaning that evidence put forth to demonstrate the first two plus

---

[136] *In re Chocolate.*, 801 F.3d at 401.

[137] *In re Flat Glass*, 385 F.3d at 361.

[138] *In re Ins. Brokerage*, 618 F.3d at 322 (internal quotation marks omitted).

factors is less meaningful), and to show that Mylan acted pursuant to an agreement through "traditional conspiracy evidence."

*Communications between the Parties*

Communications and exchanges of pricing information between competitors can create a reasonable inference of conspiracy where there is evidence that those exchanges of information had an impact on pricing decisions, particularly where those conversations occur between company representatives with pricing authority.[139]

DPPs have produced evidence that representatives of Mylan, Sandoz, and Taro communicated about clomipramine during the period when each company implemented similar price increases.[140] In support of their assertion, DPPs offer a detailed narrative analysis of various communications between the firms, illustrated previously in this decision, beginning on March 18, 2013, when Ara Aprahamian began working with Taro.[141] Several of these communications occurred between representatives of Sandoz or Taro and Mylan representatives—Nesta or Aigner. On April 3, Aprahamian created a document regarding pricing decisions that identified 10 generic drugs, including clomipramine.[142] The next day, April 4, 2013, phone records reflect Aprahamian spoke with Aigner, a Mylan employee, for 15 minutes and then, after speaking with Aigner, immediately called Bihari, a Sandoz employee.[143] Aigner has not yet testified as to the contents of his phone call with Aprahamian, but Bihari testified that *his* communications with Aprahamian included an agreement that Sandoz would follow Taro's

---

[139] *In re Flat Glass*, 385 F.3d at 368-69.

[140] *See* DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 47-48, No. 16-CM-27241 [Doc. No. 159].

[141] *Id*.

[142] *See* Metadata, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 19, No. 16-CM-27241 [Doc No. 159-21].

[143] *See* Phone Record, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 21, No. 16-CM-27241 [Doc No. 159-23].

price increases and not take market share.[144] On April 8, Mylan identified clomipramine as a "Taro price increase item."[145] On April 19, Bihari spoke with Aprahamian on the phone for 13 minutes, immediately after which Aprahamian phoned Aigner.[146] On April 30, Bihari and Aprahamian spoke on the phone three times, on which day Bihari made a note indicating clomipramine as a price increase item with a line pointing to "T, M, S," which DPPs contend stands for Taro, Mylan, and Sandoz.[147] The next day, on May 1, 2013, Aigner called and spoke with Aprahamian on the phone.[148] Between May 8 and 10, Aigner and Aprahamian spoke five times and on May 10, Nesta sent an email saying that he did not "want to take business from [Taro] thinking we are not following."[149]

As discussed above in the Court's analysis on direct evidence, Lubke and Nesta communicated several times regarding pricing decisions despite the fact that they had no previous, personal relationship. Both parties draw significant attention to two phone calls between Lubke and Nesta on July 16.[150] As detailed above in connection with DPPs' direct evidence, Lubke testified that, during this phone call, she asked Nesta what Mylan's price

---

[144] *See* Bihari Tr., DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 5, at 781, No. 16-CM-27241 [Doc No. 159-7].

[145] *See* Nesta Tr., DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 11, at 211-12, No. 16-CM-27241 [Doc No. 159-13].

[146] *See* Phone Record, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 21, No. 16-CM-27241 [Doc No. 159-23].

[147] *See id.*; Bihari Notebook, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 31, at 28 No. 16-CM-27241 [Doc No. 159-33].

[148] *See* Phone Record, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 21, No. 16-CM-27241 [Doc No. 159-23].

[149] DPP/EPP Clomipramine Presentation at 17i (May 13, 2025); Nesta Email, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 54, No. 16-CM-27241 [Doc No. 159-54].

[150] *See* Lubke Tr., DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 7, at 774-76, No. 16-CM-27241 [Doc No. 159-9].

increases were "so that [Sandoz] could follow."[151] Nesta, according to Lubke, subsequently provided her with that pricing information. Lubke further testified that her superiors at Sandoz, who did have authority to make pricing decisions, specifically asked her to obtain information about Mylan's price increases and advised her that Sandoz wanted to follow Mylan's price increases.[152] Mylan argues that Bihari and Vezza both testified that they did not conspire with Mylan. Lubke, they argue, testified that she did not "make any commitment" to Mylan—although she did testify that she gathered pricing information with the intent that Sandoz would follow.[153] Her testimony that she did not "commit" to anything is irrelevant, DPPs argue, in light of her testimony that the purpose of her phone call with Mylan was to gather price information so that her superiors at Sandoz could form a decision based on that information.[154]

Mylan argues that the phone logs do not reflect traditional evidence of a conspiracy because DPPs have not shown that the communications "rise to the level of an agreement, tacit or otherwise."[155] The question is whether the phone logs, notes, and deposition testimony together create a basis by which a reasonable factfinder could conclude that Mylan, Sandoz, and Taro developed a common plan and made pricing decisions based on those conversations.

The Third Circuit has held that the mere opportunity for improper communications is insufficient to support an inference of conspiracy, [156] and that "sporadic" communications between individuals without pricing authority cannot form the basis of a reasonable inference of

---

[151] Lubke Tr., Mylan Defs.' Mem. Law Supp. Mot. Summ. J. Ex. 89, at 475 [DPPs], No. 16-CM-27241 [Doc. No. 150-82].

[152] *Id*. at 473-74.

[153] *Id.* at 1224-25; Vezza Tr., Mylan Defs.' Mem. Law Supp. Mot. Summ. J. Ex. 120, at 701-02 [DPPs], No. 16-CM-27241 [Doc. No. 150-110].

[154] *See* DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 33-34, No. 16-CM-27241 [Doc No. 159].

[155] *In re Baby Food,* 166 F.3d at 126.

[156] *In re Chocolate*, 801 F.3d at 409.

a conspiracy.[157] Similarly, the "exchange of pricing information by lower level employees" is
not sufficient to defeat summary judgment where the evidence consisted "of sporadic exchanges
of shop talk among field sales representatives."[158] In contrast, the evidence that higher-level
defendants communicated close in temporal proximity to parallel price announcements, and that
exchanges of information were tightly linked with allegedly concerted action, raises a reasonable
inference of concerted action.[159]

   To determine whether DPPs can correlate information exchanges with "specific collusive
behavior,"[160] "[a] court must look to the evidence as a whole and consider any single piece of
evidence in the context of other evidence."[161] DPPs rely not only on calls between competitors,
but they place those calls in the context of Defendants' actions, which is enhanced by the timing
of those calls to and between competitors of various firms, contemporaneous emails that confirm
that competitors exchanged pricing information, and ultimately the pricing decisions that
occurred in temporal proximity to phone calls. In other words, it is not just that Aigner or Nesta
occasionally called or received calls from representatives of Sandoz or Taro, but that those calls
occurred immediately before or after pricing decisions, and that those calls occurred in tight
temporal proximity with calls to and between other representatives. Viewed in the totality, the
evidence that Aprahamian and Aigner spoke for 15 minutes on April 4, and that Aprahamian
then *immediately* called Bihari after speaking with Aigner and that, four days later on April 8,
Mylan identified clomipramine as a "price increase item," weighs in favor of establishing an

---

[157] *Id.*; *In re Baby Food,* 166 F.3d at 125.

[158] *In re Baby Food,* 166 F.3d at 125.

[159] *In re Flat Glass,* 385 F.3d at 369.

[160] *Id.*

[161] *Id.*

inference of conspiracy. Similarly, Aprahamian's one minute call to Aigner on April 19 is, alone, not inherently supportive of a conspiracy, but the inference is strengthened by the fact that it occurred directly between a 13-minute call between Bihari and Aprahamian and two subsequent phone calls between Bihari and Aprahamian—all between 2:28 pm and 3:30 pm, which was followed by Nesta's May 1 email indicating that Mylan will not "take share" from Taro. Similarly, it is not a leap of logic to infer that Nesta's May 10 email that Mylan should not "take business from [Taro]" because it would lead Taro to "think [Mylan is] not following" can be related to a series of phone calls between Aprahamian and Aigner, as well as Nesta and Aigner, between May 8 and 10.[162] This evidence also aligns with Lubke's testimony that she intended that Sandoz follow Mylan's prices and that she communicated as much to Nesta, who willingly provided her with Mylan pricing information.

DPPs have produced sufficient evidence that, if credited by the factfinder, would establish this factor.

*Advance Knowledge*

DPPs argue that Mylan had advance knowledge of Taro's price increase, drawing an inference that Mylan obtained information about Taro's planned price increase through a conversation with Aprahamian and Aigner on April 4, 2013, three weeks before Taro announced its price increase.[163] DPPs cite several contextual facts that they argue strengthen the reasonableness of this assumption: (1) immediately after completing the April 4th phone call with Aigner, Aprahamian called Bihari, (2) that Aigner texted his boss, Jim Nesta, later that day, (3) that Aigner and Nesta led the Customer Focus List project for Mylan's sales team, which

---

[162] Nesta Email, DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. Ex. 54, No. 16-CM-27241 [Doc No. 159-54].

[163] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 48, No. 16-CM-27241 [Doc No. 159].

removed clomipramine from its "Customer Focus List"[164] because it was a "Taro price increase item" on April 8, 2013, and (4) that clomipramine was still on the Customer Focus List as of April 2, 2013, meaning that the shift to remove it occurred between April 2 and April 8.[165]

Mylan contends that it, in fact, learned of Taro's price increase from CVS, pointing to a May 21, 2013 email from Mylan Pricing and Contracts to Nesta which says, in part, that CVS came to Mylan on March 11, 2013, "after pricing had been increased by the incumbent."[166] Regardless, Mylan argues that a small group of Mylan employees, which did not include Nesta or Aigner, in fact made the decision to reexamine clomipramine on the Customer Focus List and that, on April 9, that team revisited their decision to remove clomipramine and reverted it to its position before the April 4 phone calls.[167] As DPPs point out, the email to Nesta originated in May 2013, months after Mylan supposedly learned that Taro increased its prices on CVS and therefore cannot be viewed as an objective record of what occurred in March. DPPs do, in fact, allege that the May email contains incorrect information about the actual record of price fluctuations that occurred in March 2013 and contend that Taro at that point had actually *decreased* its price to CVS.[168]

Mylan contends that an inference of conspiracy on this evidence is unwarranted because the evidence does not tend to exclude the possibility that the conspirators acted independently.[169] Plaintiffs must demonstrate that their inference is reasonable in light of competing inferences of

---

[164] *Id*. ("[A]n internal list for tracking opportunities for sales growth at certain customers for certain drugs.").

[165] *Id*. at 48-49.

[166] CVS Account Data Email, Mylan Defs.' Mem. Law Supp. Mot. Summ. J. Ex. 51 [DPPs], No. 16-CM-27241 [Doc. No. 150-44].

[167] Mylan Defs.' Reply Br. Supp. Mot. Summ. J. at 28-29 [DPPs], No. 16-CM-27241 [Doc. No. 164].

[168] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 49-50, No. 16-CM-27241 [Doc No. 159].

[169] *Matsushita*, 475 U.S. at 588.

independent action.[170] Although DPPs have not presented ironclad evidence on this point,

Mylan's counter evidence, given its faults, does not render DPPs' explanation unreasonable.

Material issues of disputed facts render this a jury question.

*Fifth Amendment Invocations*

DPPs argue that the Court should draw adverse inferences from the invocation of Fifth

Amendment rights against self-incrimination during depositions of certain witnesses. Such

evidence can sometimes be used to draw an adverse inference in civil cases, when the silence of

a corporation's personnel can be attributed to the corporation.[171] This issue, however, is

premature. Three of the witnesses: Nesta, Aigner, and Kellum have all agreed to withdraw their

invocations of the Fifth Amendment and be deposed again.[172] With regard to Aprahamian, the

Court ordered that he sit for a second deposition and determine anew whether to invoke his right

to silence.[173] Under these circumstances, the Court will not draw adverse inferences for purposes

of summary judgment at this time.

---

[170] *Id.*

[171] *Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275 (3d Cir. 1986).

[172] *See* June 11, 2025 Order [MDL Doc. No. 3450].

[173] Aprahamian asserted his Fifth Amendment right to every question during his initial deposition. EPPs likely knew that he would do so, given that he was, at the time, under criminal investigation by federal authorities. When he was first deposed in September 2023, Aprahamian was under federal indictment pending charges for two counts of conspiracy to restrain trade in violation of 15. U.S.C. § 1 and one count of making a false statement in violation of 18 U.S.C. § 1001(a)(2) in connection with an alleged agreement to allocate customers for, and fix the prices of, generic pharmaceuticals. Indictment, *United States v. Aprahamian*, No. 20-64 (E.D. Pa. Feb. 4. 2020) [Doc. No. 1]. The government dismissed those charges with prejudice on November 29, 2023. Order, *United States v. Aprahamian*, No. 20-64 (E.D. Pa. Nov. 29, 2023) [Doc. No. 98]. Subsequently, Aprahamian filed his own civil action in the United States District Court for the Southern District of New York against other Defendants in this matter. Complaint ¶ 2, *Aprahamian v. Sandoz Inc.*, No. 24-9045 (S.D.N.Y. Dec. 6, 2024) [Doc. No. 6]. Because Aprahamian must, in his own lawsuit, provide detail regarding many of the same allegations for which he had previously asserted the Fifth Amendment, this Court has ordered Aprahamian to sit for a second deposition, during which he may still assert his Fifth Amendment right "provided that he can assert in good faith that he has a reasonable fear of prosecution in light of the fact that filing the SDNY Action would seem to manifest a willingness by Aprahamian to testify in support of his claims at this time." June 16, 2025 Order [MDL Doc. No. 3463].

*Economic Evidence*

DPPs rely on economic evidence put forth by their expert, Professor McGuire, who opined that the clomipramine market behaved in a noncompetitive manner.[174] The Court has previously determined that Professor McGuire's analyses satisfy the *Daubert* standard.[175] In his report, Professor McGuire "found no instances of two or more firms increasing the price of a generic drug by 200% or more in the same quarter" and that "the Clomipramine price increases were unprecedented in magnitude compared to similar oligopolistic generic drug markets."[176] Mylan, however, argues that DPPs cannot use Dr. McGuire's opinion as traditional evidence because he was instructed, in his analysis, to assume that a jury would find a conspiracy.

Dr. McGuire's analysis that the clomipramine price increase can only be explained by collusion is appropriate and reliable in this matter. Dr. McGuire was not asked to assume that a jury would find that a conspiracy occurred, but rather was asked to assume that a jury would find—if it found a conspiracy—that it began "sometime between March 18, 2013 (Ara Aprahamian's starting date at Taro) and May 1, 2013 (the date of Taro's clomipramine price hike)."[177] This instruction cabined the period of Dr. McGuire's review, but it did not require him to presume that there was a conspiracy. His conclusions on that matter are based on his review of the evidence and his own methodologies.

---

[174] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 55, No. 16-CM-27241 [Doc No. 159].

[175] *In re Generic Pharms. Pricing Antitrust Litig*., No. 16-MD-2724, 2024 WL 4989070 at *8-15 (E.D. Pa. Dec. 5, 2024).

[176] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 56, No. 16-CM-27241 [Doc No. 159].

[177] McGuire Expert Report, Mem. Supp. Defs.' Mot. Exclude McGuire Ex. 1 at 5, No. 16-CM-27241 [Doc. No. 93-2].

*Remaining Arguments*[178]

Mylan raises additional factual arguments against DPPs' evidence. DPPs respond that those additional arguments are disputed issues of fact to be resolved by a jury. For example, Mylan argues that clomipramine was unprofitable and that three generic manufacturers exited the market before 2012 because of low market prices.[179] DPPs dispute that claim, as well as Mylan's contention that clomipramine was unprofitable before the price increases, or that its supposed unprofitability would justify a 2,500% price increase.[180] Mylan further claims that evidence shows that its price increase was based on the branded version of clomipramine, which DPPs dispute by way of arguing that the branded drug's price cannot justify the magnitude of the price increase.[181] Mylan emphasizes its decision to raise the price of clomipramine by 6% in July 2012, which DPPs have argued was a pre-planned hike developed as early as December 2012 that does bear on the alleged conspiracy.[182] Each of Mylan's points represents a disputed issue of material fact that DPPs have countered with reasonable explanation that is inappropriate for resolution on summary judgment.[183]

Viewing the evidence as a whole, Plaintiffs have produced sufficient evidence from which a reasonable factfinder could conclude that it is more likely than not that Defendants conspired to fix prices. Mylan's parallel price increase in 2013 does not in itself raise an

---

[178] The Court does not address any arguments related to Mylan's provision of clomipramine to CVS in this section, because DPPs excised those transactions from their class definition. Mylan's sales to CVS are discussed below in connection with their motion for summary judgment against EPPs.

[179] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 2 [DPPs], No. 16-CM-27241 [Doc. No. 150].

[180] DPPs' Mem. Opp'n Mot. Summ. J. Mylan Defs. at 56-57, No. 16-CM-27241 [Doc No. 159].

[181] *Id*. at 57.

[182] *Id.*

[183] See *In re Chocolate*, 801 F.3d at 397 (quoting *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 467 (3d Cir.1998)) ("At the same time, 'defendants are [not] entitled to summary judgment merely by showing that there is a plausible explanation for their conduct; rather the focus must remain on the evidence proffered by the plaintiff and whether that evidence tends to exclude the possibility that the defendants were acting independently.'").

inference of conspiracy.[184] Further, the first two plus factors weigh less strongly in DPPs' favor than the third because the Third Circuit has explained that in price fixing cases involving oligopolies, "the first two factors largely restate the phenomenon of interdependence,' . . . [which] leaves traditional non-economic evidence of a conspiracy as the most important plus factor" in an oligopolistic market.[185]

However, DPPs have produced sufficient traditional evidence of a conspiracy to survive summary judgment. DPPs' evidence that Mylan engaged in frequent communication, in tandem with other evidence suggesting that they made certain pricing decisions in temporal proximity of those communications, along with the economic evidence from Dr. McGuire, sufficiently shows that circumstantial evidence can establish a reasonable inference that Mylan participated in a conspiracy to raise the prices of clomipramine.

*Conspiracy Period*

Mylan also argues that DPPs have not presented any evidence of a conspiracy during the five-year period from 2014 to 2018.[186] Mylan points out that while the last communication identified by DPPs was October 4, 2013, DPPs allege a class period that continues until December 31, 2018. Mylan argues that courts have dismissed claims "where there are no specific facts establishing the existence of a conspiracy for the entire time period alleged."[187] Mylan argues that lingering effects of the price agreements are not sufficient to support the allegations in this case, particularly where the parties have engaged in significant discovery.

---

[184] *See Valspar,* 873 F.3d at 196.

[185] *In re Chocolate,* 801 F.3d at 398.

[186] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 36 [DPPs], No. 16-CM-27241 [Doc. No. 150].

[187] *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd*., No. 08-42, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015).

Although DPPs do not point to specific communications after 2013, the continuation of allegedly artificially inflated prices through 2018 may be evidence of a price fixing conspiracy because the nature of such a conspiracy is that it brings about higher prices over a period of years.[188] Under antitrust law, each sale to a customer at the post-conspiracy price is an injury to the purchaser. Here, DPPs have produced evidence that Mylan maintained its WAC price at the 2013 level for several years. Summary judgment will not be granted on the basis of the conspiracy period.

### Comcast

Mylan argues that DPPs' "one-size-fits-all" model is incapable of disaggregating effects attributable to market allocation and bidding conduct, in violation of the Supreme Court's holding in *Comcast Corp. v. Behrend*.[189] In *Comcast*, plaintiffs proposed four separate theories of antitrust impact to certify a class of Comcast subscribers under Rule 23(b)(3) for alleged damages of federal antitrust laws.[190] The Court extensively reviewed and addressed Defendants' *Comcast* argument at *Daubert* and Class Certification.[191] DPPs allege a single conspiracy claim under Section 1 of the Sherman Act. For the reasons set forth in the earlier decisions, *Comcast* does not provide a basis for summary judgment as to Mylan.

Upon consideration of Mylan's arguments and the DPPs' evidence, the Court will deny Mylan's motion for summary judgment against DPPs in the clomipramine case.

---

[188] *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

[189] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 21-22 [DPPs], No. 16-CM-27241 [Doc. No. 150].

[190] *Comcast*, 569 U.S. at 30-31.

[191] *In re Generic Pharms Pricing Antitrust Litig.*, 2024 WL 4989070 at *20 ("In *Comcast*, plaintiffs proposed four separate theories of antitrust impact to certify a class of Comcast subscribers under Rule 23(b)(3) for alleged damages of federal antitrust laws. In contrast, DPPs assert one theory of antitrust impact; that is, a conspiracy to increase prices resulting in a single theory of antitrust injury.") (citations omitted).

37

B.    **Defendants' Motions in EPP Case**[192]

Defendants in the EPP clomipramine class action are Actavis Holdco U.S., Inc., Actavis Pharma, Inc., Mylan Inc., Mylan Pharmaceuticals, Inc., Taro Pharmaceuticals U.S.A., Inc., Wockhardt USA LLC and Morton Grove Pharmaceuticals, Inc. Both EPPs and Defendants have filed motions for summary judgment.

The Court's analysis below addresses an individual motion from Mylan, a joint motion by Defendants, and a joint motion by Sandoz and Taro.

1.    <u>Mylan</u>

Mylan's motion as to EPPs' case in some ways mirrors the motion in the DPPs' case. Where applicable, the Court will refer to its earlier analysis. However, Mylan also raises distinct arguments in the EPP case, particularly with regard to sales of clomipramine to CVS.

Mylan contends that EPPs cannot show that it conspired to fix the price of clomipramine, noting that the long-running DOJ investigation ended with no action taken on clomipramine as against Mylan.[193] Mylan argues that EPPs have failed to plead or meet the rule of reason standard, to put forward evidence of a conspiracy or to show that circumstantial evidence can create a reasonable inference of conspiracy, and that EPPs have no triable claims of conduct after 2013.

Mylan again argues that the rule of reason test, not the *per se* standard, applies, which would require the Court to assess whether the challenged conduct was an anticompetitive practice.[194] As discussed above, EPPs have adduced evidence of a conspiracy through

---

[192] EPPs have separately moved for partial summary judgment in the clomipramine and clobetasol matters. The Court addresses those arguments separately.

[193] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 2 [EPPs], No. 16-CM-27241 [Doc. No. 302].

[194] *Id*. at 34.

communications, testimony, conduct, documents, and economic evidence.[195] The Court will thus evaluate EPPs' evidence under the *per se* standard.

*Direct and Circumstantial Evidence*

EPPs rely upon essentially the same evidence as DPPs, with the exception of the expert evidence relating to causation and damages. The Court incorporates those facts here. As with the DPPs' case, the EPPs have failed to produce sufficient direct evidence of a conspiracy. Also as with the DPPs' case, EPPs have put forth sufficient circumstantial evidence to raise a triable issue as to most of the claims, including with regard to the duration of the conspiracy. However, the DPP and EPP claims diverge on a significant issue. DPPs specifically carved out claims flowing from Mylan's provision of clomipramine to CVS pharmacy. EPPs have not done so. Thus, although many of the factors weighing in favor of finding that DPPs could show traditional evidence as a plus factor apply in EPPs' case, the Court must examine separately evidence relating to CVS to determine the outcome of the EPPs' motion.

As discussed in connection with Defendants' joint motion, the evidence shows that Mylan did not increase the price paid by CVS during the relevant period. In examining that motion, the Court addressed the question of whether a reasonable jury could weigh the evidence and find that end-payers, as a class, paid more for CVS clomipramine than they would have in the but-for world. There, the Court determined that a reasonable jury could determine that overcharges to EPPs flowed from CVS's acquisition of clomipramine from manufacturers other than Mylan, even if CVS purchased far more clomipramine from Mylan during the relevant time period than it did from those other manufacturers. Here, the question is slightly different. Mylan's motion affects only the clomipramine supply to CVS pharmacy purchased from Mylan.

---

[195] EPPs' Resp. Opp'n Taro, Sandoz, & Mylan Defs.' Mots. Summ. J. at 60, No. 16-CM-27242 [Doc. No. 324].

Thus, the Court need only analyze whether a reasonable jury could hold Mylan liable for overcharges when it did not, in fact, raise prices for clomipramine to CVS pharmacy.

According to Mylan, Taro supplied clomipramine to CVS until March 2013, when Mylan identified CVS as a potential customer and approached the pharmacy, offering a lower price for the drug than Taro had been supplying.[196] Although CVS initially rejected Mylan's lower offer, in March "Mylan and CVS agreed on prices that were 19%-28% lower than Taro's then-current price."[197] Following this negotiation, CVS did not pay prices for clomipramine above what it had paid before the alleged conspiracy.[198] Going forward, CVS pharmacy accounted for more than 40% of Mylan's clomipramine sales, which Defendants argue account for 25% of the total volume of clomipramine commerce in this matter.[199]

Mylan maintains that it won CVS's business by offering lower prices than Taro while EPPs allege that, although CVS did not pay elevated prices above their alleged pre-conspiracy levels, CVS would have paid even less than it did in the pre-conspiracy period for clomipramine but for communications between Mylan and Taro.[200] According to EPPs, Taro stopped competing with Mylan for CVS's clomipramine business in agreement with Mylan: "[b]y ceding the CVS Clomipramine business to Mylan, [Michael] Perfetto [of Taro] aimed to forestall further price competition and get his competitors to follow future price increases."[201] In support of this

---

[196] Mylan Defs.' Mem. Law Supp. Mot. Summ. J. at 8 [EPPs], No. 16-CM-27241 [Doc. No. 302].

[197] *Id*. at 9.

[198] *See id*. at 18.

[199] Mylan Defs.' Reply Br. Supp. Mot. Summ. J. at 8 [EPPs], No. 16-CM-27242 [Doc. No. 348].

[200] *See* EPPs' Resp. Opp'n Taro, Sandoz, & Mylan Defs.' Mots. Summ. J. at 12-15, No. 16-CM-27242 [Doc. No. 324].

[201] *Id*. at 13.

theory, EPPs offer records of a phone call between Aigner and Bihari on March 8, 2013, and testimony from Bihari that he received sensitive information about Taro drug pricing.[202]

Traditional evidence of a conspiracy requires that the plaintiffs provide "proof that the [conspirators] got together and exchanged assurances of common action or otherwise adopted a common plan."[203] As discussed in DPPs' motion, a reasonable factfinder could conclude that Mylan generally participated in a conspiracy to fix the price of clomipramine with regard to the over 50% of its clomipramine sales that did *not* go to CVS. The sales to CVS must be considered separately.

To underpin their contention that CVS could have paid even less for clomipramine if not for the alleged conspiracy, EPPs rely on communication between Aprahamian, who was then an employee at Actavis, and Aigner and the fact that Taro canceled a proposed price decrease to CVS, which EPPs argue was an agreement to "cede" the business to Mylan, but which the Defendants contend was a result of typical, competitive negotiations.[204] This evidence is too sparse to permit an inference that CVS paid an inflated price for clomipramine. Mylan's motion for summary judgment is granted in part as to their sales to CVS pharmacy and denied as to sales to other entities.

In summary, the Court grants Mylan's motion in part as to EPPs' claims related to sales of clomipramine to CVS pharmacy and denies the motion as to the rest of Mylan's arguments.

---

[202] Phone Record Summary, EPPs' Resp. Opp'n Taro, Sandoz, & Mylan Defs.' Mots. Summ. J. Ex. 53, No. 16-CM-27242 [Doc. No. 324-63].

[203] *In re Flat Glass*, 385 F.3d at 361.

[204] EPPs' Resp. Opp'n Taro, Sandoz, & Mylan Defs.' Mots. Summ. J. at 78, No. 16-CM-27242 [Doc. No. 324].

2.  <u>Defendants' Joint Motion</u>[205]

Preliminarily, the scope of EPPs' claims has changed since the briefing on summary judgment. At class certification, the Court certified two classes of end-payer plaintiffs: entities asserting claims under state antitrust laws and entities asserting claims under state Consumer Protection laws. The Court did not, however, certify EPPs' proposed Unjust Enrichment class because "[t]he determination of the extent of each parties' equitable remedy would require individualized fact finding and the balancing of individual interests in a manner that is incompatible with class certification."[206] The parties thereafter stipulated to remove the Unjust Enrichment claims from the EPPs' cases.[207] Thus, the Court addresses arguments in Defendants' briefing regarding the Antitrust and Consumer Protection classes but will not address arguments regarding the Unjust Enrichment class.

Defendants' primary arguments are: (1) that EPPs cannot establish standing; (2) that EPPs fail to establish that Defendants caused any injury; (3) that EPPs' state law claims fail because their Sherman Act claim fails, (4) that certain claims are time barred due to state statute of limitations; and that (5) several consumer protection claims fail because of statute-related issues.

---

[205] Mylan and Taro filed notices stating their intent to join "in full" the arguments of their co-defendants that EPPs cannot provide sufficient evidence to support an inference of a clomipramine conspiracy among Defendants. EPPs argue that these notices have no basis in the Federal Rules of Civil Procedure or this Court's orders regarding summary judgment briefing. EPPs are correct that the Court did not provide for the filing of separate "joinders," but ultimately the issue is moot. The Court has not granted any motion for summary judgment on the basis that EPPs did not provide sufficient evidence to support an inference of a clomipramine conspiracy.

[206] *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2025 WL 754567 at *17 (E.D. Pa. Mar. 7, 2025).

[207] May 8, 2025 Order, No. 16-CM-27242 [Doc. No. 403].

*Standing*

EPPs must possess both Article III standing and standing to assert an antitrust violation,

which are separate analyses.[208] Defendants argue that they are entitled to summary judgment on

EPPs' claims due to lack of both antitrust and Article III standing.

### a) *Article III Standing*

Regarding Article III standing, both parties initially cross-moved for summary judgment

on the issue. Defendants argue that EPPs bear the burden of establishing Article III standing

"which requires the named plaintiffs to either reside in or purchase product from the jurisdictions

where they based their claims"[209] EPPs, they argue, fail to meet this burden because they have

conceded that no named plaintiff resides in multi- jurisdictions. EPPs contend that the named

Plaintiffs, at least one of whom purchased clomipramine in the majority of jurisdictions, have

standing to serve as class representatives for purchasers in the jurisdictions in which none paid

for clomipramine because the laws of those jurisdictions are "materially the same" as in the

jurisdictions in which named Plaintiffs *did* pay for clomipramine.[210]

The Court addressed this issue at the motion to dismiss stage, declining to dismiss the

issue on a similar Article III standing argument:

> Group 1 EPPs' and IRPs' allegations are sufficient to demonstrate a substantial
> and shared interest in proving that Group 1 Defendants' alleged unlawful conduct
> resulted in overpayments for the Group 1 drugs, injuries redressable by an award
> of damages under the state antitrust, consumer protection and unjust enrichment
> laws cited in the Group 1 EPP and IRP complaints. Because the state law claims
> of the named Group 1 EPPs and IRPs largely parallel those of the putative class
> members, it is both proper and more efficient to consider whether they may
> pursue their claims on behalf of the unnamed class members in the context of the
> class certification analysis required under Rule 23 of the Federal Rules of Civil

---

[208] *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 532 (1983).

[209] Defs.' Mem. Law Supp. Joint Mot. Summ. J. at 15 [EPPs], No. 16-CM-27242 [Doc. No. 301].

[210] EPPs' Resp. Opp'n Defs.' Joint Mot. Summ. J. at 15, No. 16-CM-27242 [Doc. No. 323].

Procedure (e.g., commonality and typicality under 23(a), and predominance under 23(b)). Therefore, Group 1 EPPs' and IRPs' claims on behalf of absent class members will not be dismissed for lack of Article III standing.[211]

At class certification, the Court determined that the question was settled in its previous ruling:

> The Court did not previously call into question whether unnamed plaintiffs in these cases possess Article III standing, and as it previously held, where 'success on the claim under one state's law will more or less dictate success under another state's law and the laws are materially same there is a sufficient personal stake' in litigating the claims. As to the Antitrust and Consumer Protection Classes, Defendants have not shown a basis to deny standing.[212]

During the hearings on summary judgment, the parties agreed that the issue of Article III was resolved at class certification.[213]

Here, again, the Court determines that EPPs have presented facts that pertain to Article III standing to satisfy the summary judgment standard. EPPs allege that at least one named Plaintiff has standing to pursue claims in each jurisdiction in which they assert claims.[214] Further, the First Circuit has explained that plaintiffs successfully demonstrate a basis for Article III standing where "success on the claim under one state's law will more or less dictate success under another state's law" and the "laws are materially the same," such that "the fact that judgments for some class members will nevertheless enter under the laws of states other than the states under which any of the class representatives' judgments will enter . . . has no relevant bearing on the personal stake of the named plaintiffs in litigating the case[.]"[215] The Court will address whether EPPs have sufficiently demonstrated that there is no dispute regarding their Article III standing in connection

---

[211] *In re Generic Pharms. Pricing Antitrust Litig.,* 368 F. Supp. 3d at 831 (citations omitted).

[212] *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 754567 at *18 (citation modified).

[213] Summ. J. Hr'g Tr. at 104, 119 (May 13, 2025) [MDL Doc. No. 3396].

[214] *See* EPPs' Br. Supp. Mot. Partial Summ. J. ¶ 2, No. 16-CM-27242 [Doc. No. 292].

[215] *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018).

with EPPs' partial motion for summary judgment. But for purposes of this motion, Defendants have not shown that EPPs lack Article III standing under the summary judgment standard.

Accordingly, the Court affirms previous rulings that the EPPs have demonstrated that they possess Article III standing to bring claims in the Antitrust and Consumer Protection Classes.

### b) *Antitrust Standing*

To establish antitrust standing, EPPs must demonstrate that they have suffered an injury of the type that the antitrust laws are intended to prevent and that the injury flows from Defendants' acts.[216] EPPs assert claims for damages under various state laws, as the Supreme Court's decision in *Illinois Brick Co. v. Illinois* bars indirect purchasers from recovering damages under the federal antitrust laws.[217] The majority of states, however, have passed *Illinois Brick* repealer statutes, which allow indirect purchasers to bring antitrust claims for damages under *state* antitrust law.

The Court applies the standing requirements under the law of each applicable state. The requirements for antitrust standing are described in the applicable statutes of each state within EPPs' antitrust and consumer protection classes.[218] Defendants contend that, to establish antitrust standing, EPPs must demonstrate that their claims in 26 jurisdictions meet the requirements for antitrust standing under *Associated General Contractors of California, Inc. v. California State Council of Carpenters (AGC)*.[219] In *AGC*, the Supreme Court evaluated the claims of workers who sought employment with a construction project that was allegedly halted due to an antitrust

---

[216] *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 164 (3d Cir. 2017) (citation modified).

[217] *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736 (1977). EPPs can still seek injunctive relief under federal law.

[218] See *In re Wellbutrin*, 868 F.3d at 163 n.53.

[219] 459 U.S. 519 (1983). The Third Circuit recognized such a requirement in *Barton & Pittinos, Inc. v. SmithKline Beecham Corp*., 118 F.3d 178, 181 (3d Cir. 1997).

violation. The Supreme Court upheld the dismissal of the workers' claims as too remote, determining that the issue turned on the principles of proximate cause, explaining that "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."[220] The decision limits federal antitrust standing so as to prevent duplicative recovery by remote parties and provides a set of considerations to guide courts as they determine whether a plaintiff is the proper party to bring a private antitrust action.[221] The Third Circuit has refined the Supreme Court's considerations into the following factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;
> (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;
> (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims;
> (4) the existence of more direct victims of the alleged antitrust violations; and
> (5) the potential for duplicative recovery or complex apportionment of damages.[222]

In ruling on motions to dismiss, the Court determined that the question of antitrust standing is properly resolved at the summary judgment stage.[223] At that juncture, the Court determined that EPPs had satisfied the requirements for antitrust standing under Rule 12(b)(6), but noted that further discovery could reveal that EPPs' claims are not "merely byproducts of the anticompetitive effects of the restraint[s]" alleged.[224]

---

[220] *AGC*, 459 U.S. at 535. *See also id.* at 35-36 (noting "a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages") (citation omitted).

[221] *Id.* at 535 n.31.

[222] *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993).

[223] *In re Generic Pharms. Pricing Antitrust Litig.,* 338 F. Supp. 3d at 457-58.

[224] *Id*. (internal citation omitted).

In seeking summary judgment, Defendants again argue that EPPs fail to satisfy the *AGC* factors because (1) they fail to account for the conduct of third parties, (2) there are more direct victims of the antitrust violations, and (3) there may be duplicative damages recovered by DPPs and EPPs.[225] EPPs, in turn, argue that Defendants overstate the applicability of *AGC*, which ruled on standing for federal antitrust claims, to their state-law based claims and dispute that the *AGC* factors apply in several states.[226] As to which of the jurisdictions at issue would require the Court to analyze the *AGC* factors for state law claims, the parties disagree. However, if the EPPs satisfy the *AGC* test, they perforce meet the standards of every state.[227] The Court therefore starts with the *AGC* factors.

### *Type of Injury*

Initially, the EPPs satisfy the second factor because this matter involves claims of price-fixing, which are squarely within the purview of the antitrust laws. Defendants do not dispute that EPPs satisfy this requirement—the second factor weighs in favor of antitrust standing.

### Causal Connection, Intent, and Directness of Injury

The first and third factors, the causal connection and intent of harm, and the directness of the injury, are related. The first factor involves assessing whether the antitrust violation is the source of plaintiff's harm, and whether defendant knowingly engaged in that anticompetitive behavior.[228] Defendants contend that EPPs fail to account sufficiently for the numerous third parties in the generic drug supply chain, including Pharmacy Benefit Managers ("PBMs"), wholesalers, and retailers, which they argue "break the causal chain…" between Defendants'

---

[225] Defs.' Joint Mot. Summ. J. at 13-14, No. 16-CM-27242 [Doc. No. 301].

[226] EPPs' Mem. Opp'n Defs.' Joint Mot. Summ. J. at 14, No. 16-CM-27242 [Doc. No. 323].

[227] *See Davis v. Hanna Holdings, Inc.,* 771 F. Supp. 3d 552, 577 (E.D. Pa. 2025); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* 64 F. Supp. 3d 665, 696-97 (E.D. Pa. 2014).

[228] *In re Lower Lake Erie Iron Ore ,* 998 F.2d at 1165.

conduct and EPPs' alleged injury.[229] In this matter, EPPs are generally health payors that allege they purchased or reimbursed clomipramine for their members. There are, as Defendants point out, interstitial entities in the drug supply chain between the manufacturers and end payers, namely wholesaler direct purchasers and pharmacies. However, reimbursement for or purchases of pharmaceutical products by an end payer can satisfy the first factor.[230] Here, EPPs have sufficiently alleged a causal connection between Defendants' supposed conspiracy and overcharges. Importantly, EPPs' experts have examined the role of third-party intermediaries in that causal chain and have plausibly opined that their damages analyses account for the roles of those parties.[231] EPPs' damages claims are not speculative and are represented by the higher prices paid for generic drugs in the alleged conspiracy period as compared to the period before the alleged conspiracy. Further, EPPs allege that Defendants engaged in a conspiracy to raise the prices of generic clomipramine. Because the entire theory of a price fixing claim relies on intentional cooperation between competitors, they also have satisfied the intent prong of the first factor.

The third factor addresses the directness of injury, which can "absorb[] the question of causal connection."[232] This factor must carry less weight in those states that have passed *Illinois Brick* repealer laws that allow indirect purchasers to pursue antitrust claims, than it does in the federal law context.[233] "[S]trict application of this factor, in the context of indirect purchasers,

---

[229] Defs.' Joint Mot. Summ. J. at 13, No. 16-CM-27242 [Doc. No. 301].

[230] *See In re Suboxone,* 64 F. Supp. 3d at 697; *In re K–Dur Antitrust Litig.,* 338 F. Supp. 2d 517, 543 (D.N.J. 2004).

[231] The Court has addressed the validity of Dr. McClave's opinions and his analysis regarding intermediaries at *Daubert*. Further, the Court has discussed above that Dr. McClave's opinions on injury, including his analysis of third parties, are sufficient to survive summary judgment.

[232] *In re Lower Lake Erie Iron Ore,* 998 F.2d at 1168.

[233] *See In re Suboxone,* 64 F. Supp. 3d at, 697-98 ("It would be inconsistent for a state to allow indirect purchasers to bring antitrust claims, only for the courts to cursorily dismiss those claims on antitrust standing grounds simply because they have been brought by indirect purchasers.")

would always caution against standing, an outcome incompatible with the purpose of *Illinois Brick* repealer statutes."[234] Regardless, EPPs here do allege that they suffered a direct injury—manufacturers, they alleged, raised their list prices, which in turn caused their own overcharges.[235] Although there are intermediaries in the chain, EPPs have alleged that the path of their overcharge runs directly from the manufacturer Defendants and, through expert opinion, have asserted that those overcharges did not result from the actions of intermediaries. The first and third factors weigh in favor of EPPs.

<u>More Direct Victims</u>

For the fourth factor, the Court assesses whether there are more direct victims of an alleged antitrust violation than EPPs.[236] Defendants argue that the fourth factor weighs against EPPs because direct purchasers are more direct victims of the alleged conspiracy and they have asserted their own claims in this MDL.[237] Defendants cite one case from the Northern District of Illinois for the proposition that "[D]irectness of the injury weigh[ed] 'particularly heavily' in the Court's analysis" where 'direct purchasers [were] actively pursu[ing] their claim.'"[238] But the District Court in that case determined that the involvement of direct purchasers led the court to conclude that the indirect purchasers lacked antitrust standing to pursue their *federal* antitrust claims.[239] Whether there are direct purchaser plaintiffs in a case involving state antitrust claims

---

[234] *Id*. quoting (*D.R. Ward Constr. Co. v. Rohm & Haas Co*., 470 F. Supp. 2d 485, 503 (E.D. Pa. 2006)).

[235] *See D.R. Ward*, 470 F. Supp. 2d at 503 (finding directness where "plaintiffs allege[d] that they paid an inflated price for plastics additives due to defendants' price-fixing agreement," even though plaintiffs did not purchase directly from defendants).

[236] *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165-66.

[237] Defs.' Joint Mot. Summ. J. at 14, No. 16-CM-27242 [Doc. No. 301].

[238] *Id*. (quoting *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig*., 2013 WL 4506000, at *14 (N.D. Ill. Aug. 23, 2013)).

[239] *In re Dairy Farmers*, 2013 WL 4506000, at *15.

is less revealing because that factor would, again, always caution against finding standing for indirect purchasers. In effect, indirect purchasers would then never be permitted to bring a suit under state antitrust laws where direct purchasers also bring such a case, which would effectively bar indirect purchasers from seeking relief under those state statutes. This contravenes the purpose of *Illinois Brick* repealer statutes.

This factor does not weigh in favor of EPPs, in that direct purchasers do exist. However, because of the state-level policy considerations as to states with *Illinois Brick* repealer statutes, the fourth factor is not determinative in the Court's balancing of the AGC factors.

<u>Duplicative Recovery</u>

Finally, the fifth factor cautions against finding that an entity has standing where there is potential for duplicative recovery.[240] Defendants contend that this factor weighs against EPPs because "(i) the actions brought by the direct purchasers and Indirect Reseller Plaintiffs create the possibility of duplicative damages; and (ii) EPPs are many steps removed from Defendants in the chain of distribution, which makes apportioning damages unusually complex."[241] Defendants' point is taken that the apportionment of damages could be complex, but such work is not uncommon in intricate antitrust cases and Defendants have not demonstrated that apportionment here is so difficult as to justify relief to EPPs. Without more, the risk of duplicative recovery does not weigh against EPPs. EPPs have demonstrated that they have standing to pursue their state antitrust claims. Defendants' arguments as to standing on consumer protection claims also rely on the *AGC* factors.[242] It is not necessary to decide whether the *AGC*

---

[240] *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1165-66.

[241] Defs.' Joint Mot. Summ. J. at 14, No. 16-CM-27242 [Doc. No. 301].

[242] *Id*. at 15.

factors apply to consumer protection laws, as the Court has determined that EPPs can meet their burden.

*Failure to State Injury*

Defendants contend that EPPs cannot demonstrate that they suffered any injury as a result of Defendants' conduct, and thus fail to meet their burden of proving causation.[243] Defendants argue that, because of the presence of intermediaries such as PBMs, EPPs have failed to establish causation or damages as a matter of law because they cannot demonstrate that any higher price they paid for clomipramine resulted from Defendants' alleged conduct, and they have no evidence that could allow a jury to reasonably estimate damages.[244] The primary fault in EPPs' damages case, according to Defendants, is that EPPs' expert Dr. McClave is unreliable, and that his damages model cannot be used to show injury or damages. EPPs present Dr. McClave as an expert to opine on class-wide impact and damages.[245] As discussed in the ruling on the motions to exclude expert testimony, Dr. McClave conducted a multiple regression analysis to find that all, or nearly all, of class members in EPPs' classes experienced at least one overcharge due to Defendants' alleged price increases.[246] Dr. McClave's regression analysis functions as follows:[247]

First, Dr. McClave performed analyses that utilized aggregated, averaged data:

- In Step 1, Dr. McClave tested, at a high level, whether manufacturer list prices such as WAC exhibit a correlative relationship with other prices in the clobetasol and clomipramine supply chains.

---

[243] *Id.* at 2-11.

[244] *Id*. at 3.

[245] *See* McClave Corrected Expert Report [Clomipramine] at 1-2, No. 16-CM-27242 [Doc. No. 201-3] (hereinafter "McClave Clomipramine Rep.").

[246] *See id.* at 22, 29, 33.

[247] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784 at *4-5 (citations omitted).

- In Step 2, Dr. McClave analyzed whether there was any correlation between pharmacy reimbursements and end-payer costs.

After determining that broad trends indicate a high correlative between list prices and actual prices paid by end payers, Dr. McClave performed individualized analyses to assess actual impact and damages:

- In Step 3, Dr. McClave assessed pharmacy acquisition costs encompassed in Defendants' data to compare prices that pharmacies paid during his "Benchmark Period"[248] to the prices that the pharmacy paid for the product from each defendant during his "Class Period." Dr. McClave found that more than 99 percent of pharmacies experienced a price increase for each product.

- In Step 4, Dr. McClave used the same data to analyze price increases for end-payers using PBM data, finding that 99 percent of end-payers experienced a price increase for both drugs during the Class Period.

- In Step 5, to calculate damages, Dr. McClave conducted Stage 1 of his multiple regression analysis, which controlled-at a transactional level-for innocent market forces to estimate "but for" prices for each pharmacy. Here, Dr. McClave found that more than 99 percent of pharmacies paid elevated prices for both drugs during the Class Period.

- In Step 6, Dr. McClave conducted Stage 2 of his multiple regression analysis and utilized PBM data during the Benchmark period to account for innocent market features in order to determine competitive end-payer drug costs at a transactional level. Here, Dr. McClave compared end-payer drug costs to the output of Stage 1 of his multiple regression analysis to estimate a "passthrough" ratio that Dr. McClave then uses to estimate a "but for" price for each end payer, for each product, in each month of the Class Period.

Defendants argue that summary judgment is warranted because Dr. McClave's analysis:

(a) fails to establish that Defendants' alleged agreement to raise list prices caused any EPP to pay

a higher price for clomipramine; (b) fails to account for the conduct of intermediaries, such as

PBMs; and (c) fails to offer any proof of damages for certain of EPPs' theories of harm.[249]

---

[248] For clomipramine, the Benchmark Period is January 1, 2009 through February 28, 2013. *See* McClave Clomipramine Rep. at 20 & n.39.

[249] Defs.' Joint Mot. Summ. J. at 3, No. 16-CM-27242 [Doc. No. 301].

Plaintiffs asserting antitrust allegations "must establish that the damages suffered were caused by the defendant[s']" alleged misconduct.[250] Causation is more difficult to establish in indirect purchaser cases such as EPPs', in contrast to DPPs, who purchased directly from Defendants. Indirect purchasers must "account for the actions" of third parties as part of their damages case.[251] The Court determined that Dr. McClave's model is reliable under the *Daubert* standard and further found his method sufficient to certify two classes of EPPs. In fact, the Court has already addressed each of Defendants' arguments against Dr. McClave and determined that he sufficiently addressed the role of intermediaries, provided reliable evidence that Defendants' WAC list increases caused increased payments by EPPs, and was not the result of impermissible averaging.[252] Further, the Court determined that Dr. McClave's analyses were satisfactory to support class certification for two classes of EPPs:

> Although each entity in the generic drug supply chain depends on individual negotiations with those entities below and above it, EPPs have demonstrated for purposes of class certification that common evidence can demonstrate economic impact. Dr. McClave's finding that virtually every customer, at both the pharmacy and end-payer level, incurred at least one overcharge is sufficient to show that evidence of impact is common to the class despite individual negotiations. … Dr. McClave's methodology analyzed overcharges at a transactional level, which accounted for variation across purchasers and manufacturers, as well as other aspects of the market.[253]

The relevant question at this stage is whether a reasonable factfinder who heard all of EPPs' evidence, including Dr. McClave's analysis, could determine that injury resulted from the defendants' alleged antitrust violations.[254] A plaintiff sustains antitrust injury at the moment they

---

[250] *In re Lower Lake Erie Iron Ore*, 998 F.2d at 1176 (internal citation omitted).

[251] *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008) (internal citation omitted).

[252] *In re Generic Pharms. Pricing Antitrust Litig.,* 2024 WL 4980784, at *9-10.

[253] *In re Generic Pharms. Pricing Antitrust Litig.,* 2025 WL 754567, at *12,15.

[254] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009).

were overcharged, regardless of their ability to later offset those overcharges through damage calculation adjustments.[255] Defendants argue that EPPs cannot, as a matter of law, prevail on causation or damages because they cannot show the link between Defendant manufacturers and those alleged overcharges due to faults in Dr. McClave's models. Given the slate of evidence that Dr. McClave analyzes, EPPs counter that a reasonable juror could weigh the evidence, especially under the summary judgment standard, and find that the conspiracy was a material cause of increased prices for EPPs.[256]

EPPs cite the following evidence: causal inferences drawn from Defendants' price spikes, documentary and testimonial evidence that Defendants' price increases raised prices throughout the market, economic evidence that the clomipramine market was conducive to the formation of a cartel, experts' before-and-after price analysis that virtually all pharmacies paid twice as much for clomipramine after the price increases, empirical correlation and price trend analyses "using standard, well-accepted methods" that all found a relationship between Defendants' prices for clomipramine and downstream end-payer prices, Dr. McClave's multiple regression analysis which showed "that 99% of pharmacies and 99% of end-payers paid elevated prices for Clomipramine because of Defendants' price increases," the multiple regression analysis of another expert, Dr. Lamb, which demonstrated "positive and statistically significant empirical relationship" between Defendants' WAC prices and end-payer prices, and statistical and record analyses that eliminate other potential causes of the price spikes.[257]

As the Court previously held, Dr. McClave's analysis is reliable under *Daubert*, and Defendants' disagreements with his conclusions are not a basis for summary judgment.

---

[255] *See In re Niaspan Antitrust Litigation*, 464 F. Supp. 3d 678, 711 (E.D. Pa. 2020).

[256] EPPs' Mem. Opp'n Defs.' Joint Mot. Summ. J. at 12-13, No. 16-CM-27242 [Doc. No. 323].

[257] *Id*. at 3-5.

Considering all of EPPs' evidence, including analysis from EPPs' experts, a reasonable juror could find that the Defendants caused Plaintiffs' overcharge injuries. The Court will deny summary judgment on both the Sherman Act claim and the state law claims, as all are premised on the same conduct.

*Comcast*

Defendants argue that they are entitled to summary judgment on "market-allocation and bid-rigging claims" because Plaintiffs "offer no proof of damages attributable to those two theories of liability."[258] Defendants maintain that Dr. McClave did not allocate his damages calculation to the specific conduct alleged. EPPs assert that their market-allocation and bid-rigging allegations "are not independent theories of anticompetitive impact [as] in *Comcast*" but rather "levers" by which Defendants effectuated the alleged price-fixing conspiracy.[259] The Court has previously rejected Defendants' claims that EPPs' case fails due to *Comcast*:[260]

> In *Comcast*, Respondents proposed four separate theories of antitrust impact to certify a class of Comcast subscribers under Rule 23(b)(3) for alleged damages of federal antitrust laws. The district court in that matter accepted only one theory as capable of class-wide proof, rejecting the rest in its certification order. To certify class in that case, Respondents' expert Dr. McClave offered a regression model that the Supreme Court later determined did not properly isolate damages resulting from any of the particular theories of impact put forth by the plaintiffs, and thus was not appropriately tied to the remaining theory of impact in the case. Finding issue with Dr. McClave's model, Justice Scalia held that '[i]t follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory,' because any model at class certification must be consistent with a plaintiffs' theory of liability. In *Comcast*, Dr. McClave's flaw was that his model assumed the validity of the three theories of impact that had been excluded from the case. Dr. McClave's model could not reliably demonstrate impact to the class from the remaining theory advanced by the class because it could not disaggregate 'that single theory's effect from the effects of the three theories not suitable for class treatment.' The Court

---

[258] Defs.' Joint Mot. Summ. J. at 11, No. 16-CM-27242 at 11 [Doc. No. 301].

[259] EPPs' Mem. Opp'n Defs.' Joint Mot. Summ. J. at 11, No. 16-CM-27242 [Doc. No. 323] (internal citation omitted).

[260] *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784, at *9 (citations omitted).

reasoned, however, that his methodology may well been determined to be sound if those theories had remained in the case.

Here, as in the Court's previous decisions, EPPs' one theory of liability remains in place. *Comcast* is not a ground on which to grant summary judgment.

### CVS Clomipramine Purchases

Defendants also allege that no antitrust injury flowed from CVS's purchases of clomipramine from Mylan.[261] Defendants argue that the undisputed evidence shows that the prices paid by CVS to Mylan did not increase at all during the alleged conspiracy period even though the WAC price did. Crucially, Defendants argue that Dr. McClave's model improperly attributes to Defendants all downstream price increases for clomipramine sold by Mylan to CVS. But, as Defendants argue, those increases were a result of intermediaries and were not affected by Defendants' actions.[262]

EPPs contend that a reasonable juror could find injury from sales of Mylan clomipramine to CVS. According to EPPs, CVS raised its end-payer clomipramine prices by 1600% immediately after Defendants' upstream list price increases. Although Defendants argue that the source of this increase could not be the list price increases, because CVS bought most of its clomipramine from Mylan at no price increase, EPPs maintain that Defendants are liable for the increase under antitrust principles. EPPs argue they do not need to prove that the alleged conspiracy *solely* caused harm, but that "[i]t is enough that the illegality is shown to be a material cause of the injury."[263] Defendants, they argue, propose a legal rule under which indirect purchasers must somehow trace an illegal overcharge transaction-by-transaction throughout the

---

[261] Defs.' Joint Mot. Summ. J. at 11, No. 16-CM-27242 [Doc. No. 301].

[262] *Id.*

[263] EPPs' Mem. Opp'n Defs.' Joint Mot. Summ. J. at 9, No. 16-CM-27242 [Doc. No. 323] (internal citation omitted).

chain. EPPs argue that a reasonable jury could weigh the evidence and find that end-payers paid more for CVS clomipramine than they would have in the but-for world. This, they argue, is backed by certain evidence: the timing and magnitude of the end-payer clomipramine increases that followed WAC price increases by Defendants, Dr. McClave's regression model that ruled out other causes for the elevated end-payer prices on CVS for Mylan clomipramine, and case-specific economic analysis that "because Defendants' list prices are used as reference prices throughout the market, the cartel's list price increases led directly to higher prices at both the pharmacy and end-payer levels."[264]

EPPs' argument boils down to the following: although Mylan did not raise its contractual prices for clomipramine to CVS, CVS nonetheless paid more for clomipramine than it would have in a but-for world without a price-fixing conspiracy because of over charges from the small amount of clomipramine that CVS sourced from the other manufacturers. EPPs allege that CVS paid higher prices for clomipramine, despite their contract with Mylan, because CVS paid higher prices to Sandoz and Taro for approximately 6% of its clomipramine and because Taro and Mylan coordinated to ensure that CVS would not receive an even lower contract price for the drug. [265] This, in turn, resulted in CVS charging third-party payers clomipramine prices 1600% above the pre-conspiracy level.

The Court addressed these arguments at class certification, finding that this issue did not prevent the certification of EPPs' classes.[266] The Court did, however, exclude the opinions of Defendants' expert Dr. Hughes under *Daubert*, including his opinion that EPPs did not suffer

---

[264] *Id.* at 11 (emphasis omitted).

[265] *Id.* at 12.

[266] *See In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 754567, at *13-15.

injury resulting from sales to clomipramine to CVS.[267] At class certification, the Court noted that the question of injury flowing from CVS is disputed between the parties. Now, at summary judgment, the Court determines that a reasonable factfinder could find that the alleged conspiracy was the but-for cause of increased end-payer prices flowing from CVS for clomipramine. At least some of CVS's clomipramine purchases, approximately 6%, came from Taro and Sandoz at inflated list prices. Although CVS sourced significantly less clomipramine from those manufacturers than it did from Mylan, whose summary judgment arguments the Court will address below, antitrust injury occurs where the plaintiff incurred even one overcharge.[268] A reasonable juror could find that overcharges paid by EPPs included purchases that flowed from clomipramine that CVS purchased from Taro and Sandoz on that basis. Defendants' motion for summary judgment on this issue is thus denied.

### Statute of Limitations

Defendants argue that EPPs' claims are untimely under the laws of several states because the EPPs' first complaint was filed on January 26, 2017,[269] more than three years after the alleged collusion occurred between May and July of 2013. EPPs have filed a motion for partial summary judgment on this issue.[270] Defendants also move for summary judgment, contending that claims under the following state laws are time-barred:[271]

- Antitrust claims with three-year statutes of limitations: Kansas, Mississippi, Tennessee.

---

[267] *See id.* at *9.

[268] See *In re Niaspan*, 464 F. Supp. 3d at 709 ("In contemplation of law the claim for damages arose at the time the extra charge was paid.") (quoting *Adams v. Mills*, 286 U.S. 397, 407 (1932)).

[269] Class Action Compl., *Teamsters Loc. Union No. 727 Health & Welfare Fund v. Mylan, Inc.*, No. 17-1124 (D.P.R. Jan. 26, 2017) [Doc. No. 1].

[270] EPPs' Mem. Supp. Partial Summ. J. at 9-15, No. 16-CM-27242 [Doc. No. 292].

[271] Defs.' Joint Mot. Summ. J. at 16, No. 16-CM-27242 [Doc. No. 301].

- Consumer protection claims with two- or three-year statutes of limitations: Alaska, Colorado, Delaware, Virginia.

Defendants also challenge the timeliness of claims under state laws with limitations periods of at least four years to the extent that they arise out of alleged conduct that occurred in 2009.[272] However, EPPs do not appear to assert in this case that 2009 is the "appropriate trigger date" for the alleged conspiracy.[273] Defendants point to a complaint in another case filed by EPPs in which the plaintiffs contend that the Defendants engaged in a multi-drug conspiracy involving 165 products, and for many of which they argue the challenged conduct began in 2009.[274] In the multi-drug complaint, EPPs assert that their clomipramine action is "related to" and part of the broader conspiracy that they allege.[275] But they do not, as Defendants argue, allege that the clomipramine conspiracy at issue here began in 2009, or suggest that Defendants should be liable in this matter for conduct that began before the 2013 price increases. The Court will assess Defendants' timeliness arguments as to the claims with a two- or three-year statute of limitations with the understanding that the challenged conduct in this matter is alleged to have begun in 2013.[276]

EPPs first argue that claims "arising from purchases made *within* the applicable limitations period are timely."[277] EPPs argue that they may seek redress for injury incurred

---

[272] Defs' Joint Reply Summ. J. at 10 n.12, No. 16-CM-27242 [Doc. No. 347].

[273] *Id*.

[274] Am. Compl. *1199SEIU Nat'l Benefit Fund v. Actavis Holdco U.S. Inc.*, No. 19-6011 (E.D. Pa. Sept. 4, 2020) [Doc. No. 61].

[275] *Id*. at 4-5 n.2.

[276] EPPs seek partial summary judgment as to claims with limitations periods of at least four years. EPPs' Mem. Partial Summ. J. at 27, No. 16-CM-27242 [Doc. No. 292]. The Court does not make such a finding in this Opinion and only notes that Defendants have not moved for summary judgment as to those statutes.

[277] EPPs' Mem. Opp'n Defs.' Joint Mot. Summ. J. at 16, No. 16-CM-27242 [Doc. No. 323].

through continuing harm within the limitations period even without the benefit of tolling.[278]
EPPs have cross-moved for summary judgment on this point and the Court will address those
arguments separately.[279]

With regard to the remaining claims, EPPs argue that the application of the discovery rule and
fraudulent concealment doctrine provide bases to deny Defendants' motion.[280]

The discovery rule tolls the running of a statute of limitations until a plaintiff was aware
or should have been aware that they had been harmed by a defendant's alleged wrongdoing.
EPPs, Defendants argue, had "every reason" to know of or at least investigate their alleged
injuries given that the WAC list price increases were publicly available and well known
throughout the industry.[281] However, the pertinent question is not whether EPPs should have
known that the price of generic clomipramine had increased, but whether they should have
known that Defendants allegedly had conspired to increase prices. That is particularly relevant
here because a coordinated price increase alone could have an innocent explanation in an
oligopolistic market—as Defendants are well aware. EPPs' access to information that would lead
them to believe that a conspiracy occurred was necessarily limited, as evidence evincing a
conspiracy typically occurs behind closed doors and in private conversations between
competitors. Thus, without evidence other than the publicly available price increase data and the
suspicion that such closely timed increases might be indicative of a conspiracy, a reasonable jury
could determine that the EPPs could not reasonably have been aware of the alleged conspiracy

---

[278] *Id*. at 18 n.41.

[279] *See* EPPs' Mem. Partial Summ. J. at 28-29, No. 16-CM-27242 [Doc. No. 292].

[280] *Id*.

[281] Defs.' Joint Mot. Summ. J. at 17, No. 16-CM-27242 [Doc. No. 301].

until Defendants disclosed their receipt of subpoenas from the Department of Justice in 2016.[282] Before that time, according to EPPs, "no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Clomipramine."[283]

Courts have recognized the discovery rule in each state at issue, Kansas, Mississippi, Tennessee, Alaska, Colorado, Delaware, and Virginia, as applied to the antitrust laws, consumer protection laws, or laws of the state in general.[284] Thus, the relevant question for the Court is whether the laws apply the same standards for assessing whether the discovery rule applies and whether, given the analysis above, the EPPs can meet the summary judgment standard in each of those jurisdictions. Defendants argue that the discovery rule in each of the relevant jurisdictions requires that EPPs had "exercise[d] diligence to investigate and discover a potential injury."[285]

As to claims under state antitrust laws with statutes of limitations under 4 years—Kansas, Mississippi, and Tennessee—the parties largely agree that the laws of Kansas permit the use of the discovery rule in the antitrust setting at the standard discussed above, that the plaintiff did not know or cannot have known that challenged conduct had occurred.

Mississippi law requires that the plaintiff "show that he 'exercise[d] reasonable diligence in determining whether an injury suffered is actionable'"[286] The Mississippi Supreme Court clarified that this means that "knowledge of certain facts which are 'calculated to excite inquiry'

---

[282] EPPs' Mem. Opp'n Defs.' Joint Mot. Summ. J. at 17, No. 16-CM-27242 [Doc. No. 323].

[283] *See* EPPs' Consolidated Class Action Compl. ¶ 166, No. 16-CM-27242 ¶ 166 [Doc. No. 127].

[284] *See* EPPs' Reply Mem. Supp. Mot. Class Certif. at 5 Ex. 1, Trial Plan Supplements at 19-23, No. 16-CM-27242 [Doc. No. 233-1]; Defs.' Joint Mot. Summ. J. at App'x E, No. 16-CM-27242 [Doc. No. 301-5].

[285] Defs.' Joint Mot. Summ. J. at 17, No. 16-CM-27242 [Doc. No. 301].

[286] *Sundbeck v. Sundbeck*, No. 10-23, 2011 WL 5006430 at *5 (N.D. Miss. Oct. 20, 2011).

give rise to the duty to inquire."[287] Defendants contend that the class members had a duty to inquire given the media attention on the generics pharmaceutical industry during the period in which the price increases occurred.[288] Due diligence requires that plaintiffs "must show that they failed, despite the exercise of due diligence on their part, to discover the facts that form the basis of their [ ] claim."[289] As EPPs point out in their complaint, however, their classes are composed of indirect purchasers who have no direct contact or interaction with the Defendants in this case, and thus a jury could determine that they had no reasonable means by which they could have investigated the Defendants' conspiracy.[290] And EPPs argue that they relied on Defendants' own public statements and codes of conduct which affirmed their own compliance with the antitrust laws and procedures for discovery of violations. Defendants have not cited any cases applying the discovery rule in similar circumstances.[291] Indeed, Defendants' primary argument relies on the assessment that increased prices do not necessarily indicate the existence of a conspiracy. But here, they argue that EPPs must have been on notice of a conspiracy when prices increased. Under Defendants' own reasoning, EPPs may have understood those increases alone, without other evidence evincing a conspiracy, to be the natural consequence of oligopoly and only when the criminal matter began were they on notice of a potential conspiracy. EPPs have established a question of material fact that their claim is not defeated by the due diligence requirement because they relied on public statements by manufacturers and had no reason to know that wrongdoing occurred until the government's criminal investigation became public.

---

[287] *Id*. (internal citations omitted).

[288] Defs.' Joint Reply Mem. at 11-12, No. 16-CM-27241[Doc. No. 347].

[289] *Sundbeck*, 2011 WL 5006430, at *2 (quoting *In re Catfish Antitrust Litig.,* 908 F. Supp. 400, 407 (N.D. Miss. 1995)).

[290] *See* EPPs' Consolidated Class Action Compl. [Clomipramine], No. 16-CM-27242 ¶ 166 [Doc. No. 127].

[291] *See id*.

Turning to Tennessee, the state Supreme Court first applied the discovery doctrine in a limited manner to surgical malpractice suits[292]and has since expanded it to apply to some injuries to person or property, but not in certain other circumstances.[293] In the context of consumer protection statutes, Tennessee courts have held that where the statute is explicit that the claim "accrues when the unlawful act or practice is discovered," the discovery rule applies.[294] The Tennessee Trade Practices Act, where the antitrust laws are codified, does not include a specific limitations period; instead, a general three-year statute of limitations applies to claims "based upon the alleged violation of any federal or state statute creating monetary liability for personal services rendered ... when no other time of limitation is fixed by the statute creating such liability."[295] Although there is no relevant case law in the antitrust context, the Tennessee courts have explicitly recognized it applies to claims under the Tennessee Trade Practices Act.[296] The Court therefore determines that the Tennessee Supreme Court would apply the discovery doctrine to antitrust cases.

Accordingly, the discovery rule applies to claims for violations under the antitrust statutes of Mississippi, Kansas, and Tennessee. EPPs have produced evidence that the EPP classes are composed of indirect purchasers who have no direct contact or interaction with Defendants in this case, and thus a jury could determine that they had no reasonable means by which they could have investigated the Defendants' alleged conspiracy at the time. EPPs also

---

[292] *Teeters v. Currey,* 518 S.W.2d 512, 516 (Tenn. 1974).

[293] *See* e.g., *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 622-23 (Tenn. 2002) (determining that the discovery rule did not toll the statute of limitations for the conversion of a negotiable instrument, given similar findings by most jurisdictions as well as certain policy considerations).

[294] *See Riad v. Erie Ins. Exch.,* 436 S.W.3d 256, 269 (Tenn. Ct. App. 2013).

[295] Tenn. Code Ann. § 28-3-105(3).

[296] *See In re Pre-Filled Propane Tank Antirust Litig.,* No. 14-2567- 2019 WL 4796528 at *15 (W.D. Mo. Aug. 21, 2019) (applying Tennessee law).

argue that they relied on Defendants' own public statements and codes of conduct affirming compliance with the antitrust laws and procedures for discovery of violations. It is for the factfinder to determine when EPPs had a duty to inquire.

As to EPPs' consumer protection state claims, there is no dispute that Alaska, Colorado, Delaware and Virginia all would apply the discovery rule.[297] For the reasons discussed above, a reasonable factfinder could determine that the consumer protection statutes of limitations in those jurisdictions were tolled under the discovery rule. The Court declines to dismiss claims under the Mississippi, Kansas, Alaska, Colorado, Delaware, and Virginia laws as untimely.

The Court denies summary judgment on the basis that any antitrust or consumer protection claim is untimely.

### Consumer Protection Claims

Defendants next argue that EPPs' Consumer Protection arguments fail for additional reasons: (1) that multiple jurisdictions do not allow indirect purchasers to bring consumer protection claims and (2) that the EPPs' Massachusetts and Missouri claims fail.

Defendants contend that EPPs' claims in Alaska, New Jersey, Delaware, and the U.S. Virgin Islands are not actionable because those jurisdictions do not allow indirect purchasers to bring such claims.[298] The Court has previously addressed the applicability of Alaska's consumer protection statute, declining to dismiss EPPs' claims under the Alaska general consumer protection law, the AUTPCPA, in its February 2019 Opinion,[299] and May 2022 Opinion. Two propositions support retaining EPPs' AUTPCPA claims: "(1) Plaintiffs may proceed under

---

[297] *See* EPPs' Reply Mem. Supp. Mot. Class Certif. at 5, Ex. 1, Trial Plan Supplements at 19-23, No. 16-CM-27242 [Doc. No. 233-1]; Defs.' Joint Mot. Summ. J. at App'x E, No. 16-CM-27242 [Doc. No. 301-5].

[298] Defs.' Joint Mot. Summ J. at 18, No. 16-CM-27242 [Doc. No. 301].

[299] *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d at 841 n.116.

general consumer protection statutes—even if their claims sound in antitrust—so long as they can plead their claims under the pertinent law; and (2) Alaska courts recognize that the same conduct could violate both the state's consumer protection and antitrust statutes."[300] Defendants cite opinions from the Northern District of Illinois and the Northern District of California holding that, because those states bar indirect purchasers from bringing suit under the antitrust provisions, AUTPCPA precludes plaintiffs from bringing claims as indirect purchasers under the state's Consumer Protection Act.[301] In the 2022 Opinion, the Court found a similar argument unavailing: "The Court accepts that the decisions of several fellow district courts support dismissing EPPs' AUTPCPA claims. Even so, the courts of Alaska have, thus far, remained silent on the relationship between AUTPCPA and the Alaska antitrust statute's indirect-purchaser bar. Given the lack of controlling authority, the Court sees no basis to alter its earlier decision and will permit EPPs' AUTPCPA claims to move forward."[302] Defendants raise no new arguments that would alter the previous holding.

Similarly, the Court has previously rejected Defendants' argument that EPPs lacked standing to assert claims under the New Jersey Consumer Fraud Act because, as third parties, EPPs "do not qualify as consumers under the NJCFA and therefore cannot assert claims under the statute."[303] In the May 2022 Opinion, the Court determined that "[u]nder New Jersey law, corporations and other entities, although not necessarily consumers in the ordinary sense, may assert NJCFA claims when they engage in a consumer oriented situation. The NJCFA does not cover all transactions. Rather, the statute's applicability hinges on the nature of the transaction,

---

[300] *In re Generic Pharms. Pricing Antitrust Litig.,* No. 16-CB-27242, 2022 WL 1470272 at * 5 (E.D. Pa. May 10, 2022).

[301] Defs.' Joint Mot. Summ. J. at App'x F at 1, No. 16-CM-27242 [Doc. No. 301-6].

[302] *In re Generic Pharms. Pricing Antitrust Litig.,* 2022 WL 1470272 at *5 (cleaned up).

[303] *Id.* at 6 (internal quotation marks, citations, and brackets omitted).

requiring a case-by-case analysis. Thus, whether EPPs may assert their NJCFA claims turns on the character of the transactions at issue, not EPPs' particular status."[304] Accordingly, the Court analyzed New Jersey case law as it applies to the matter at hand and determined that the New Jersey courts have never wholly barred third parties from bringing suit under the New Jersey Consumer Fraud Act and determined that the question may be revisited at summary judgment "[t]o the extent that further factual discovery reveals more details about EPPs' particular transactions."[305]

Defendants do not cite new factual revelations, instead citing "new authority," consisting of three cases that predate the Court's 2022 Opinion.[306] In particular, Defendants rely on *Sickles v. Cabot Corp.*, where the New Jersey Superior Court held that a consumer purchasing tires could not refashion an antitrust claim against tire component manufacturers into a claim under the New Jersey Consumer Fraud Act, largely because the consumer had not alleged fraud, misrepresentation, or any communications between those companies and himself.[307] However, EPPs *have* alleged misrepresentation here. Defendants also argue that the New Jersey Supreme Court's decision in *Wilson v. General Motors Corp.* forecloses all indirect purchaser consumer protection claims.[308] Not so. In *Wilson*, the court held that indirect purchasers are precluded from asserting Consumer Protection claims where the allegations of consumer fraud are based on violations of the state antitrust act, which constitute a violation of the New Jersey Consumer Fraud Act ("CFA"), and when there are no communications with or directed to plaintiff

---

[304] *Id.*

[305] *Id.* at **7.

[306] Defs.' Joint Mot. Summ. J. at 13 n.18, No. 16-CM-27242 [Doc. No. 301].

[307] 877 A.2d 267, 276-77 (N.J. Super. Ct. App. Div. 2005).

[308] Defs.' Joint Reply Mem. at 13-14, No. 16-CM-2724 [Doc. No. 347] (citing *Wilson v. Gen. Motors Corp.*, 921 A.2d 414 (N.J. 2007)).

consumers. The decision explicitly "leave[s] for another day whether a CFA action would be precluded when the allegations of a violation of the Antitrust Act include communications with, or statements to, New Jersey consumers that are clear violations of the CFA."[309] At bottom, the decision in *Wilson* is not, as Defendants argue, a wholesale prohibition against indirect purchaser claims under the New Jersey CFA. Thus, the Court denies summary judgment on EPPs' claim under this statute.

Defendants also argue that the Delaware Consumer Protection statute does not apply here and that this District in *In re Niaspan* recognized an "absence of authority" authorizing indirect purchasers to seek relief for alleged antitrust injury under the state consumer protection statue.[310] But in *Niaspan*, the court dismissed the plaintiffs' Delaware claim after the plaintiffs voluntarily withdrew that claim and otherwise remarked that the plaintiffs had cited no authority for the proposition that they may bring their claim under a handful of state unjust enrichment laws, Delaware included.[311] Unjust enrichment laws are no longer at issue here.[312] The Delaware Consumer Fraud Act affords a private right of action to any victim of a violation under the law to protect "legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce;" and instructs courts to "liberally construe[]" its protections "to promote its underlying purposes and policies."[313] Defendants cite no case law suggesting that Delaware courts have looked unfavorably on plaintiffs asserting Consumer Protection claims in like situations. In light of the Delaware legislature's objective that courts should construe the

---

[309] *Wilson*, 921 A.2d at 417.

[310] Defs.' Joint Mot. Summ. J. at App'x F at 1, No. 16-CM-27242 [Doc. No. 301-6].

[311] *In re Niaspan Antitrust Litig.,* 42 F. Supp. 3d 735, 760, 763 (E.D. Pa. 2014).

[312] Order, 16-CM-27242 (E.D. Pa. May 8, 2025) [Doc. No. 403].

[313] 6 Del. Code §§ 2525, 2512.

law's provisions liberally, and for lack of state judicial directive indicating otherwise, the Court declines to grant summary judgment for EPPs' Delaware Consumer Protection claim.

Defendants included Massachusetts state law in their Appendix citing authority on state consumer protection indirect purchaser bars but failed to include their challenge in briefing. Defendants state that their "inadvertent omission caused no prejudice,"[314] although the Court notes that EPPs did not, consequently, include Massachusetts state law in their corresponding Appendix. Defendants previously asked the Court to dismiss EPPs' claims under Massachusetts law, arguing that EPPs had failed to comply with the Massachusetts Consumer Law statute pre-filing-notice requirement.[315] The Court did not at that time determine if EPPs were bound by that requirement. Here, Defendants make no specific argument relating to the pre-filing-notice requirement but cite one Eastern District of Michigan case in which that court declined to enforce the Massachusetts consumer protection statute between two businesses, holding that Massachusetts courts had not extended the availability of consumer protection claims of unfair or deceptive trade practices as between businesses to indirect purchasers.[316] Similarly, the District of Massachusetts has held that the statute requires courts to construe the consumer protection law in harmony with the state Antitrust Act to preclude claims by indirect purchasers.[317] Although the Massachusetts Supreme Court has carved out an exception to this rule for individuals who bring suit under section 9 of the statute, it has not done so for businesses entitled to bring claims under section 11.[318] Consequently, the Court grants summary judgment for EPPs' consumer

---

[314] Defs.' Joint Reply Mem. at 13 n.17, No. 16-CM-27241 [Doc. No. 347].

[315] *In re Generic Pharms. Pricing Antitrust Litig.,* 2022 WL 1470272, at *7.

[316] *In re Automotive Parts Antitrust Litig.*, 2013 WL 2456612, at *29 (E.D. Mich. June 6, 2013).

[317] *Massachusetts Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms., Inc*., 2025 WL 928747, at *15 (D. Mass. Mar. 27, 2025).

[318] *Ciardi v. F. Hoffmann-La Roche, Ltd.,* 762 N.E.2d 303, 309-10 (Mass. 2002).

protection claims arising from the Massachusetts consumer protection law that applies to claims against businesses.[319]

Moving on to the Virgin Islands, Defendants cite a case from the District Court of the Virgin Islands which held that since "[n]either the Third Circuit nor the Supreme Court of the Virgin Islands has determined whether an indirect purchaser….is considered a 'purchaser or lessee or prospective purchaser or lessee' for purposes of the Virgin Islands Code. . . ." under the Consumer Protection Law ("CPL"), it would apply the Third Circuit's interpretation that the similar Pennsylvania statute "does not protect private persons who were not the direct purchaser."[320] EPPs, however, argue that they rely not on the CPL, but on the Consumer Fraud and Deceptive Business Practice Act,[321] which affords a private right of action to "[a]ny person or business that is injured by a deceptive trade practice;" broadly prohibits "unfair methods of competition" in "the conduct of any trade or commerce;" and instructs courts to construe the Act "liberally."[322] Moreover, the Superior Court of the Virgin Islands rejected the conclusion that the CPL applies only to interactions between purchasers and sellers, holding that although the Pennsylvania statute permits only claims for direct purchases, the CPL states that "'a consumer may bring an action' and a 'consumer' includes prospective, as well as actual, purchasers and lessees" among other differences.[323]

Given the interpretation of the law by the territorial court, the Court will not grant summary judgment on EPPs' claims under the law of the Virgin Islands.

---

[319] Mass. Gen. Laws ch. 93A, § 11.

[320] *MRL Dev. I, LLC v. Whitecap Inv. Corp.,* 2014 WL 793132, at *6 (D.V.I. Feb. 26, 2014).

[321] V.I. Code Ann. tit. 12A § 301, *et seq*.

[322] *Id*. at §§ 331, 304, 302.

[323] *Gov't of United States Virgin Islands v. Takata Corp.,* 2017 WL 3390594, at *33 (V.I. Super. Ct. June 19, 2017).

In sum, the Court declines to grant summary judgment for claims under the consumer protection laws of Alaska, New Jersey, Delaware, and the U.S. Virgin Islands. Defendants' joint motion for summary judgment will be granted as to EPPs' consumer protection claims arising from Massachusetts law.

Defendants next argue that Missouri law limits recovery to injuries arising out of non-commercial conduct. Defendants rely on two cases, one from the Eastern District of New York and another from the Eastern District of Virginia, which concluded that claims under the Missouri Merchandising Practices Act[324] applies only to consumers using a product for "personal, family, or household purposes," even if it does permit recovery by indirect purchasers.[325] This Court previously determined in the 2019 Opinion that EPPs had sufficiently alleged claims under the Missouri state consumer protection law, but the Court noted that whether they would be able to prove that they are "consumers" under those statutes would be decided later in the litigation.[326] As there are no Missouri court decisions applying the law to corporations or other entities, the Court holds that the statute's specification that consumers must use the good for personal, family, or household purposes foreclose claims by EPPs. Consequently, the Court grants summary judgment for the consumer protection claims arising out of Missouri law.

***

---

[324] Mo. Rev. Stat. §§ 407.020, *et seq.*

[325] *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 157 (E.D.N.Y. 2018); *In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 1397228, at *33 (E.D. Va. Feb. 6, 2019) (report and recommendation of magistrate judge determining under Missouri law that "[t]hird-party payors like health plans may not assert claims under this provision").

[326] *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d at 847-48.

Upon review of the Defendants' Joint Motion for Summary Judgment, the Court grants Defendants' motions for summary judgment as to the EPPs' consumer protection claims under Missouri and Massachusetts law, and the motion is denied as to the claims under the consumer protection laws of the other states.

3.  Taro and Sandoz

Sandoz Taro jointly moved for summary judgment on the grounds that the evidence reflects that Sandoz, Taro, and Mylan acted independently when setting prices for clomipramine.[327] Since the filing of summary judgment briefing, however, EPPs have reached proposed settlements with Sandoz and Taro.

In consideration of these circumstances, the court dismisses Sandoz and Taro's joint motion, without prejudice, pending the outcome of each company's respective settlement agreement with EPPs.

V.    CONCLUSION

For the reasons articulated above—

The Court will grant Defendants' joint motion for summary judgment in the EPPs' case as to consumer protection claims under Missouri and Minnesota state law and Mylan's motion for summary judgment in the EPPs' clomipramine case as it relates to EPPs' claims arising from sales of clomipramine from Mylan to CVS pharmacy. The Court dismisses Sandoz and Taro's joint motion without prejudice.

The motions will be denied in all other respects.

An order will be entered.

---

[327] Taro & Sandoz Memo Supp. Summ. J. at 1, No. 16-CM-27242 [Doc. No. 297].